[No. 27256-3-II. Division Two. January 13, 2004.]

JAMES LOEFFELHOLZ, ET AL., *Appellants*, v. CITIZENS FOR
LEADERS WITH ETHICS AND ACCOUNTABILITY NOW (C.L.E.A.N.),
ET AL., *Respondents*.

*Thomas J. West* (of *Krilich, La Porte, West & Lockner, P.S.*), for appellants.

*Hugh J. McGavick* (of *The Law Office of Hugh J. Mc-Gavick*) and *Shawn T. Newman*, for respondents.

*Christine O. Gregoire, Attorney General*, and *Jeffrey T. Even, Assistant*, on behalf of the Washington Secretary of State, amicus curiae.

*Traci A. Sammeth* on behalf of the American Civil Liberties Union of Washington, amicus curiae.

MORGAN, J. — This case includes a counterclaim for violation of the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW, as well as various other claims and counterclaims. It presents a plethora of issues. We affirm in part and reverse in part.

The events at issue occurred in the fall of 1996. They concern how the Pierce County Auditor was "remaking" absentee ballots. Preliminarily then, we must understand the "remaking" process.

Every county has a canvassing board composed of the county auditor or a designated deputy auditor, the county prosecutor or a designated deputy prosecutor, and the chair or a designated member of the county legislative body.[1] After each election, the auditor convenes the board "to process the absentee ballots and canvass the votes cast."[2]

---

[1] RCW 29.62.015(1).

[2] Former RCW 29.62.020(1) (LAWS OF 1995, ch. 139, § 2).

The meetings of the board are subject to chapter 42.30 RCW, Washington's OPMA.[3]

When an absentee ballot is issued, it is accompanied by (1) "a security envelope in which to seal the ballot after voting," (2) "a larger [return] envelope," and (3) written instructions.[4] Printed on the outside of the larger return envelope is a declaration that the voter is qualified to vote.[5] After reading the instructions, the voter marks the ballot and seals it inside the security envelope. The voter then seals the security envelope inside the larger envelope, signs the declaration on the outside of the larger envelope, and returns the larger envelope to the auditor.

In 1996, absentee ballots were processed under former RCW 29.36.060 (1991).[6] That statute provided:

> The opening and subsequent processing of return envelopes for any primary or election may begin on or after the tenth day prior to such primary or election. The opening of the security envelopes and tabulation of absentee ballots shall not commence until after 8:00 o'clock p.m. on the day of the primary or election.

> After opening the return envelopes, the county canvassing board shall place all of the ballot envelopes in containers that can be secured with numbered seals. These sealed containers shall be stored in a secure location until after 8:00 o'clock p.m. of the day of the primary or election. Absentee ballots that are to be tabulated on an electronic vote tallying system may be taken from the inner envelopes and all the normal procedural steps may be performed to prepare these ballots for tabulation before sealing the containers.

> The canvassing board shall examine the postmark, statement, and signature on each return envelope containing the

---

[3] RCW 29.62.015(4).

[4] Former RCW 29.36.045 (LAWS OF 1987, ch. 346, § 12). Currently codified as RCW 29.36.290. *See also* former WAC 434-40-190 (1988), currently codified as WAC 434-240-190.

[5] Former RCW 29.36.045.

[6] LAWS OF 1991, ch. 81, § 32. This former statute is presently codified in substance as RCW 29.36.310(3). *See also* former WAC 434-40-230, -240 (1988), and present WAC 434-240-230, -240.

security envelope and absentee ballot. They shall verify that the voter's signature is the same as that in the registration files for that voter.

Former RCW 29.36.060 had at least three effects. First, it required the canvassing board to compare the signature on the exterior of each return envelope with the signature in the voter's records, starting as early as 10 days before the election. Second, it required the board to store each unopened security (inner) envelope in a secure container until after the polls closed—except when the ballot was to be read and counted by an electronic voting machine, in which case the ballot could "be taken from the inner envelope[ ] and all the normal procedural steps . . . performed to prepare [it] for tabulation before sealing the container[ ]." Third, it required that absentee ballots not be tabulated until after the polls closed.

The second effect's exception ensured that each absentee ballot would be machine-readable once the polls closed on election night. If the ballot was properly marked, nothing needed to be done. But if the ballot was improperly marked—e.g., the voter had used red ink or circled a candidate's name—it had to be "remade" so it would be machine-readable.

In 1996, Pierce County generally used temporary election workers—often retirees—to "remake" absentee ballots. These workers would identify those ballots that were not machine-readable. Functioning in teams of two, they would then transfer the votes on those ballots to new ballots that were machine-readable[7]—but only if the voter's intent was clear. If the voter's intent was not clear, they would refer the ballot to the canvassing board.

Before October 31, 1996, the Pierce County Auditor "remade" ballots in a series of rooms known locally as "Ballots R Us." Located in the Pierce County Annex, these rooms had hallway observation windows through which

---

[7] One worker would read the votes aloud, and the other worker would mark them on a new ballot that could be machine-read.

any member of the public could view the "remaking" of ballots without entering, signing in, or obtaining a visitor pass.

By October 31, 1996, the Pierce County Auditor needed more space for "remaking" due to a huge increase in absentee ballots. To accommodate this need, she directed that "remaking" occur not just at "Ballots R Us," but also at the county's election warehouse. That warehouse was a half-mile from the Annex and did not have observation windows.

In the fall of 1996, Citizens for Leaders with Ethics and Accountability Now (CLEAN) was a nonpartisan organization. Its stated goal was "to educate the citizens of Washington state about ethics and accountability of elected officials in order to return government to the people."[8] Sherry Bockwinkel was its vice-president, secretary, and one of its directors. Susan Coffey was one of its members.

On the morning of October 31, 1996, Bockwinkel and Coffey went to the elections warehouse. The door was locked and bore a sign saying, "Knock Loudly." As someone exited, they entered without knocking or otherwise obtaining permission.

Once inside, Bockwinkel and Coffey spoke with an election worker who said they should not be there without visitors' badges. They were asked to wait until a supervisor arrived. Instead of complying, they walked down a hallway, entered an area where about 30 workers were "remaking" ballots, and began taking photographs.

At this point, Bockwinkel and Coffey were confronted by James Loeffelholz, a Pierce County deputy sheriff working overtime as a security guard. Loeffelholz asked them to leave, but they refused. A scuffle broke out as Loeffelholz, aided by an election worker named Billy Joe Arends, ejected them from the warehouse. When the scuffle ended, Bockwinkel and Coffey left.

---

[8] Clerk's Papers (CP) at 45 (emphasis omitted).

The next day, Bockwinkel and Coffey complained to Sheriff's Lieutenant Mike Reed about Loeffelholz's "[u]se of force" and "[f]ailure . . . to stop [the] assault of Ms. Coffey by Mr. Arends . . . ."[9] The record does not show what else, if anything, was said.[10] Reed commenced an internal affairs (IA) investigation, which was later closed with a finding of "not sustained."[11]

On November 2, 1996, Coffey's husband, Tom Richeson, wrote an article about the incident. He invited the reader "to imagine being thrown up against a truck and choked up to the point where you can't breath[e] by a man more than twice your size and not knowing whether you're going to live through it."[12] He added:

> Even more frightening, an officer of the law stood watching. When [Coffey] tried to resist, Pierce County Sheriff James Loeffelholz stepped in and ordered [Coffey] to "stop harassing" her attacker.
>
> . . . .
>
> Neither [Loeffelholz nor Arends] seemed to be afraid that any of the 30 or so people who were working there would contradict their official account of the incident, although it would be totally false.[13]

On November 4, 1996, Bockwinkel posted Richeson's article on CLEAN's website, where it was visited 175 times over the next two years. She also mailed it to 250 Pierce County Republicans and 1500 others statewide.

---

[9] CP at 515.

[10] Someone taped this conversation, although the record does not show who. In a deposition taken April 30, 1997 and published August 21, 2000, Bockwinkel testified that she and Coffey had "our own copies" of the tape and that she had reviewed hers. CP at 3412. On August 16, 2000, at a time when Pierce County (County) was asserting the tape had been lost, the trial court ruled that a transcript of it could be put before the jury. On August 21, 2000, the County belatedly produced the tape itself. The trial ran two or three more days, but neither party elected to put the tape or transcript before the jury.

[11] Exs. 134, 142.

[12] CP at 395-96; Ex. 17.

[13] CP at 396-97; Ex. 17.

In December 1996 and April 1997, respectively, Bockwinkel and Coffey filed similar suits in the United States District Court for the Western District of Washington. Each named Loeffelholz as a defendant, and Coffey named Arends as an additional defendant.[14] Each alleged that excessive force had been used and that her constitutional rights had been violated. Loeffelholz counterclaimed for malicious prosecution. The federal court consolidated the two suits, dismissed the constitutional-rights claims, refused jurisdiction over Loeffelholz's malicious-prosecution counterclaim, and declined to rule on issues of state election law.[15] The federal court submitted the excessive force claims to a jury which, after two trials and one appeal to the Ninth Circuit, returned a verdict in favor of Loeffelholz with respect to all claims, and a verdict in favor of Coffey with respect to her claim against Arends. According to Loeffelholz and Pierce County (County), Coffey's verdict was for "$2."[16]

In July 1998, while the federal case was still on appeal to the Ninth Circuit, Loeffelholz and Pierce County (hereafter "the plaintiffs") sued CLEAN, Coffey, Richeson, and Bockwinkel (hereafter "the defendants") in Thurston County Superior Court.[17] Loeffelholz alleged that he had been defamed by the website article and by the internal affairs complaint. Both plaintiffs alleged they had been maliciously prosecuted in the federal case. In counterclaims for damages, the defendants alleged violations of 42 U.S.C. § 1983, abuse of process, and negligence. In counterclaims against the County for reasonable attorney fees under RCW 42.30.120(2), CLEAN alleged violations of the OPMA. In a counterclaim against both plaintiffs for reasonable attorney fees under RCW 4.24.510, the individual defendants al-

---

[14] Bockwinkel also sued Pierce County and its auditor, but they were later dismissed.

[15] The federal court stated in a written opinion that it would not "litigate the legality of the balloting procedures of the Pierce County Auditor. Those procedures are matters of state law and are not before the court in this lawsuit." CP at 1024.

[16] Br. of Appellant at 15.

[17] The plaintiffs sued initially in Pierce County, but the case was transferred to Thurston County.

leged immunity from suit for defamation. We will refer to the defamation claims as "the website claim" and "the IA claim," respectively.

During discovery, the superior court ordered the plaintiffs to disclose any internal affairs tape from which transcripts had been prepared. When the plaintiffs did not comply on time, the defendants moved for sanctions. The superior court declined to impose sanctions, finding no prejudice.

Both sides made motions to dismiss various claims before trial. The court granted motions to dismiss the plaintiffs' malicious prosecution claims and all of CLEAN's counterclaims except the one based on the OPMA. The court ordered that the plaintiffs' website and IA defamation claims be tried to a jury, but that CLEAN's OPMA counterclaim be tried to the bench.

The parties made motions in limine before trial, two of which are pertinent here. The plaintiffs moved to exclude mention of the Pierce County Auditor's having incorrectly described her education in previous litigation. The defendants moved to exclude mention of the federal judge's having commented, during the earlier federal case, that Bockwinkel and Coffey were trespassers. The superior court granted both motions.

On August 15, 2000, the superior court commenced a jury trial on both defamation claims. The only evidence concerning the IA defamation claim was the written IA report quoted above. Neither the tape nor the transcript was put before the jury. Lieutenant Reed did not testify. At the end of the plaintiffs' case in chief, the defendants moved to dismiss the IA claim, and the trial court granted the motion.

On August 25, 2000, the jury found for Loeffelholz on the website defamation claim. The verdict set damages at a total of $240,000 ($60,000 against each of the four defendants).

While the jury was deliberating on the website defamation claim, the court tried CLEAN's OPMA claim. It ruled

"that ballot processing at the warehouse was subject to the Open Public Meeting law;"[18] that the County had violated that law; and that the County was liable for CLEAN's reasonable attorney fees and costs under RCW 42.30-.120(2).

On August 29, 2000, the defendants moved for judgment notwithstanding the verdict (JNOV) or new trial on the website defamation claim. They claimed jury misconduct, based on the declarations of four jurors.[19] A representative juror stated:

1. I served on the jury in the above entitled case.
2. On Monday, November 13, 2000, I received a call from Shawn Newman, attorney for defendant CLEAN, inquiring about how the jury calculated damages.
3. I told Mr. Newman that the jury looked to a juror who worked as a realtor to estimate Mr. Loeffelholz's average salary.
4. As I recall, that juror came in with the number $250,000 and explained why that was an appropriate amount based on his age, expected work life and likelihood he would probably not be made a sergeant.
5. That juror stated he could figure out how much public servants earned and estimated Mr. Loeffelholz's average salary at $30,000.
6. Another juror suggested basing damages on the two years the case has been pending times his average salary.
7. They multiplied that average salary by the number of years the suit has been on-going (2) then by the number of defendants (4) to arrive at a total of $240,000.[20]

On October 20, 2000, the trial court partly granted and partly denied a new trial on Loeffelholz's website defamation claim. The court stated orally: "I believe there was jury misconduct to bring extrinsic evidence of salary in. I believe

[18] CP at 2647.

[19] The defendants also submitted two hearsay declarations from CLEAN's counsel, the content of which was substantially similar.

[20] CP at 2532; *see also* CP at 2118-19, 2531.

that the affidavits are enough that I have to grant a JNOV, and I do it reluctantly."[21] Accordingly, the court granted a new trial on the issue of damages, but not "on the issues of liability."[22]

On March 2, 2001, the trial court made two awards of costs and reasonable attorney fees. Based on RCW 42.30-.120(2), it awarded CLEAN $50,000 in fees and $1,454 in costs. Based on RCW 4.24.510, it awarded Bockwinkel, Coffey, and Richeson a total of $50,000 in fees and $516 in costs. It declined to enter judgment until after the new trial was held.

In April 2001, the plaintiffs appealed from the order granting a new trial. The defendants cross-appealed, and the two sides now raise a host of issues.

## I

The first two issues concern the website defamation claim. Loeffelholz argues that the trial court erred by setting aside the damages portion of the verdict. The defendants argue that the trial court erred by not setting aside the liability portion of that verdict.

## A

■ ■ Loeffelholz argues that the trial court was not permitted to set aside the damages verdict on his website defamation claim. He reasons that the information in the jurors' posttrial declarations "inhered in the verdict"; that the court could not properly consider it; and that the court had no other basis for its ruling.

A jury verdict will not be set aside based on evidence that "inhere[s] in the verdict."[23] A jury verdict will be set aside

---

[21] CP at 2482.

[22] CP at 2445.

[23] *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 204-05, 75 P.3d 944 (2003); *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651 (1962); *Richards v. Overlake*

based on evidence that is "novel or extrinsic,"[24] if such evidence affected the verdict.[25] Evidence "inheres in the verdict" to the extent that it discloses the thought process of a juror individually or of the jurors collectively.[26] Evidence is "novel or extrinsic" if it is wholly outside the evidence received at trial, and thus not subject to objection, cross-examination, explanation, or rebuttal by either party.[27] Thus, evidence "inheres in the verdict" if it " 'involves merely a more critical examination' " of information produced in court, but not if it puts the jury " 'in possession of material facts which should have been supported by evidence . . . which was not offered . . . .' "[28] The trial court has discretion, the exercise of which we review only for abuse.[29]

In *Halverson v. Anderson*,[30] the Washington Supreme Court applied these concepts to facts much like those here. A teenager sued for personal injuries suffered in an auto accident. At trial, the jury was asked to decide damages only. The evidence showed that before the accident the boy had wanted to become an airline pilot, that after the accident he had been rejected for a summer job in aviation

---

*Hosp. Med. Ctr.*, 59 Wn. App. 266, 272, 796 P.2d 737 (1990), *review denied*, 116 Wn.2d 1014 (1991).

[24] *State v. Balisok*, 123 Wn.2d 114, 118, 866 P.2d 631 (1994); *State v. Gobin*, 73 Wn.2d 206, 211-12, 437 P.2d 389 (1968); *Richards*, 59 Wn. App. at 270.

[25] *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 137, 750 P.2d 1257 (1988); *Richards*, 59 Wn. App. at 271-72; *State v. Briggs*, 55 Wn. App. 44, 55-56, 60, 776 P.2d 1347 (1989); *Fritsch v. J.J. Newberry's, Inc.*, 43 Wn. App. 904, 907, 720 P.2d 845, *review denied*, 107 Wn.2d 1006 (1986).

[26] *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988); *Richards*, 59 Wn. App. at 272.

[27] *Balisok*, 123 Wn.2d at 118; *Adkins*, 110 Wn.2d at 137; *Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973); *State v. Everson*, 166 Wash. 534, 536-37, 7 P.2d 603 (1932); *Richards*, 59 Wn. App. at 270-71 (quoting *Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 357-58, 722 P.2d 826 (1986), *aff'd*, 109 Wn.2d 235 (1987)); *Fritsch*, 43 Wn. App. at 907.

[28] *Balisok*, 123 Wn.2d at 119 (quoting *Everson*, 166 Wash. at 536-37).

[29] *Breckenridge*, 150 Wn.2d at 203 (citing *Balisok*, 123 Wn.2d at 117; *Halverson*, 82 Wn.2d at 752).

[30] 82 Wn.2d 746, 513 P.2d 827 (1973).

due to his injuries, and that he presently was studying to be a civil surveyor. The evidence did not show the earnings of either a pilot or a surveyor, and thus the trial court refused to instruct on loss of earning capacity. During deliberations, nonetheless, one juror told the others "that a TWA pilot would earn $2,000 per month . . . and that a civil surveyor would earn $1,500 per month."[31] The jury returned a verdict for $20,000, which the defendant sought to vacate on grounds of jury misconduct. The trial court "found that one of the jurors had . . . introduced evidence not presented by the parties at the trial, which the defendants had no opportunity to rebut and the relevance of which they had no chance to argue."[32] The trial court also found that such evidence had probably affected the verdict. Thus, the trial court granted an order for a new trial, which the plaintiff timely appealed. The Supreme Court affirmed, stating:

> Here, one juror stated to the other jurors certain matters of fact for which he vouched and which had not been introduced in the trial. His statement was an act capable of objective proof without probing the juror's mental processes. Any juror could testify to the fact of his making the statement, and another juror could deny that he made it, and it would then become a question of deciding which juror or jurors was worthy of belief.
>
> . . . .
>
> We conclude that the superior court correctly determined that the juror who supplied the jury with information concerning the earnings of airline pilots and civil surveyors was guilty of misconduct in placing before his fellow jurors evidence which was not subject to objection, cross-examination, explanation or rebuttal by the defendants.[33]

Notably, the Supreme Court did not distinguish between information from an extrinsic source—e.g., a newspaper

---

[31] 82 Wn.2d at 747.

[32] 82 Wn.2d at 748.

[33] 82 Wn.2d at 751-52.

article[34] or an attorney not involved in the case[35]—and information from the juror's own speculation.[36]

This case is like *Halverson*. The trial court did not give an instruction that the jury could consider loss of earning capacity when fixing damages; on the contrary, it told the jury to consider "loss of reputation; shame; mortification; impairment of standing in the community; embarrassment; personal humiliation; injuries to feelings; and mental anguish and suffering."[37] During deliberations, a juror nonetheless placed before his fellow jurors salary and retirement information that was wholly outside the evidence and not subject to scrutiny by either party. The trial court did not abuse its discretion by deciding that this information did not inhere in the verdict; that the information affected the verdict; and that a new trial should be ordered on damages.

B

■ The defendants claim that the trial court was required to set aside the liability portion of the verdict on Loeffelholz's website defamation claim. According to them, the record shows, so clearly reasonable minds could not differ, that "[t]he newsletter article . . . was truthful"[38] or involved opinion rather than fact; that even if the article

---

[34] *See State v. Rinkes*, 70 Wn.2d 854, 859-63, 425 P.2d 658 (1967).

[35] *See Fritsch*, 43 Wn. App. at 906.

[36] Absent *Halverson*, we would have thought that a juror's remark during deliberations would inhere in the verdict unless shown to be based on an external source such as a newspaper article (e.g., *Rinkes*, 70 Wn.2d at 859-63) or the statement of an attorney not involved in the case (e.g., *Fritsch*, 43 Wn. App. at 906). *See Gardner*, 60 Wn.2d at 841 (verdict cannot be affected " 'by an *improper remark* of a fellow juror' ") (footnotes omitted) (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2349 (John T. McNaughton ed., 1961)). *Halverson*, however, seems to have modified *Gardner* in cases in which a juror injects unsupported information concerning the claimant's loss of earning capacity. The Supreme Court cited *Halverson*, apparently with approval, in its recent case of *Breckenridge v. Valley General Hospital*, 150 Wn.2d 197, 203, 75 P.3d 944 (2003).

[37] CP at 2075.

[38] Br. of Resp't at 65.

was not truthful, it was not defamatory;[39] that Loeffelholz "suffered no damages"; that any damages he did suffer were caused not by their article, but by "some other publication";[40] that their article was immune unless published with actual malice; and that their article "is protected speech under the circumstances of this case . . . ."[41] In our view, however, each of these matters was one on which a rational trier of fact could find either way, and thus ultimately an issue for the jury to decide. Whether we review the record independently[42] or only for substantial evidence,[43] the evidence supports each element of defamation, plus actual malice, and the trial court was not required to set aside the liability portion of the website defamation verdict.

## II

The next three issues concern the IA defamation claim. The plaintiffs claim that the trial court erred by dismissing it at the end of their case in chief. The defendants claim that evidence on the IA claim "contaminated" the jury's consideration of the website claim. Both sides contend the

---

[39] We think that this is what the defendants mean when they note that "[a] false statement will not support a defamation action unless it is apparent that the false statement presents a substantial danger to the plaintiff's personal or business reputation." Br. of Resp't at 68.

[40] Br. of Resp't at 67.

[41] Br. of Resp't at 68.

[42] *See Richmond v. Thompson*, 130 Wn.2d 368, 388-89, 922 P.2d 1343 (1996); *Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l Union, Local 1001*, 77 Wn. App. 33, 44, 888 P.2d 1196 (1995) (citing *Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 215, 356 P.2d 97 (1960) (citing *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 753, 344 P.2d 705 (1959))). *See also Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 572, 27 P.3d 1208 (2001) ("The court must decide whether the statement is capable of a defamatory meaning and the jury decides whether the statement was, in fact, defamatory.").

[43] *See Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 107 Wn.2d 524, 530, 730 P.2d 1299, *cert. denied*, 484 U.S. 815 (1987); *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982); *Wood*, 107 Wn. App. at 573; *Moe v. Wise*, 97 Wn. App. 950, 957, 989 P.2d 1148 (1999), *review denied*, 140 Wn.2d 1025 (2000).

trial court erred in calculating reasonable attorney fees under RCW 4.24.510.

## A

The plaintiffs argue that the trial court erred by dismissing their IA defamation claim at the end of their case in chief. The defendants argue to the contrary. We do not find error for at least two reasons.

■ First, the proponent of a defamation claim must show that the statement complained of is false.[44] In this case, however, the record shows only that Bockwinkel and Coffey told Reed that Loeffelholz had (1) used force and (2) failed "to stop [the] assault of Ms. Coffey by Mr. Arends . . . ."[45] The plaintiffs do not dispute that Loeffelholz used force against both Bockwinkel and Coffey.[46] The plaintiffs do not dispute that Loeffelholz asked Arends to physically eject Coffey, or that Arends did that.[47] Assuming without holding that Arends did not assault Coffey (the federal jury seems to have found that he did, at least in the sense of using excessive force), so that a contrary statement would have been false as to Arends, such a statement would not have been false as to Loeffelholz. The plaintiffs did not offer any other evidence—for example, the tape—that might have shown what Bockwinkel and Coffey said to Reed.[48] We conclude that the plaintiffs failed to produce evidence

---

[44] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 768-69, 776 P.2d 98 (1989); *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590-91, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998).

[45] CP at 515.

[46] *E.g.*, CP at 955, where Loeffelholz reports, "I began to push Coffey and Bockwinkle [sic] down the hallway towards the door[,]" and CP at 956, where Loeffelholz reports, "I was able to force Bockwinkle [sic] out the door."

[47] *E.g.*, CP at 956, where Loeffelholz reports that he asked Arends to "help me get these people out of the building[;]" that he told Arends "to take Coffey, open the door and get her outside[;]" and that Arends "did this."

[48] Someone taped this conversation, although the record does not show who. Neither party put the tape or its contents before the jury.

sufficient to support a finding that either Bockwinkel or Coffey, while speaking with Reed, made a statement that was false as to Loeffelholz.

■ Second, the proponent of a defamation claim that falls under RCW 4.24.510 must show, " 'by clear and convincing evidence, that the defendant knew of the falsity of the communications or acted with reckless disregard as to their falsity.' "[49] But if the evidence in this record is insufficient to support a finding that Bockwinkel or Coffey made a false statement as to Loeffelholz, as just discussed, it additionally and necessarily is insufficient to support a finding that Bockwinkel or Coffey " 'knew of the falsity of the communications or acted with reckless disregard as to their falsity.' "[50] The trial court did not err by dismissing the IA defamation claim at the end of the plaintiff's case in chief.

B

■ The defendants claim that the liability verdict on the website defamation claim was "improperly influenced and completely contaminated" because the jury heard evidence on the IA defamation claim that was dismissed at the end of the plaintiffs' case in chief.[51] Given that the dismissal of one claim does not automatically warrant the reversal of all other claims, their assertion can be true only if specific evidence that would not have been admissible on the IA defamation claim was improperly admitted on the website defamation claim. The defendants do not identify any such evidence, arguing only that "after the principals . . . testified . . . the jury [was] contaminated with the impression

---

[49] *Right-Price Recreation, L.L.C. v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 383, 46 P.3d 789 (2002) (quoting *Gilman v. MacDonald*, 74 Wn. App. 733, 739, 875 P.2d 697, *review denied*, 125 Wn.2d 1010 (1994)).

[50] *Right-Price Recreation*, 146 Wn.2d at 383 (quoting *Gilman*, 74 Wn. App. at 739).

[51] Br. of Resp't at 74.

that filing the IA claim was wrong."[52] Nor do we perceive any such evidence, for virtually the entire stream of events, including the making of the IA complaint, had a tendency to prove or disprove malice, an essential element on the website defamation claim. The defendants have not shown that the IA claim "contaminated" the jury's consideration of the website defamation claim.

## C

Both sides contend that the trial court erred when it set reasonable attorney fees in favor of the individual defendants under RCW 4.24.510. The plaintiffs claim that the trial court erred by not requiring the individual defendants to segregate their fees for the compensable IA claim from their fees for other claims, and thus that the trial court arbitrarily awarded fees in too high an amount. The defendants respond that the trial court erred by "fail[ing] to describe on the record the method used in calculating the award[;]"[53] by requiring them to segregate their fees; and by "[h]olding statutorily mandated attorney fees hostage until some potential future retrial . . . ."[54] The plaintiffs ask us to deny fees or remand for a redetermination of fees, while the defendants ask us to remand "for [a] determination of full attorney fees as non severable."[55]

## 1

■■■ Preliminarily, we must identify the claim or claims on which the trial court had discretion to award fees. A trial court may award reasonable attorney fees only if it has a

---

[52] Reply Br. of Resp't at 9 (emphasis omitted). *See Right-Price Recreation*, 146 Wn.2d at 384 (plaintiff did not establish prima facie case of defamation where "[it] did not identify any alleged defamatory statements").

[53] Br. of Resp't at 76.

[54] Br. of Resp't at 77.

[55] Br. of Resp't at 79.

statutory, contractual, or recognized equitable basis.[56] Except for the OPMA, which we discuss elsewhere, the only such basis apparent here is RCW 4.24.510. In 1996, RCW 4.24.510 provided:

> A person who in good faith communicates a complaint or information *to any agency of federal, state, or local government* regarding any matter reasonably of concern to that agency shall be immune from civil liability on claims based upon the communication to the agency. A person prevailing upon the defense provided for in this section shall be entitled to recover costs and reasonable attorneys' fees incurred in establishing the defense.[57]

This statute contains at least two requirements. The first is a claim based on the defendant's having "communicate[d] a complaint or information to any agency . . . regarding any matter reasonably of concern to that agency." The second is that the defendant prevail by establishing immunity.

The IA claim met both of these requirements; it was based on Bockwinkel's and Coffey's having communicated complaints to the sheriff's office, and it was a claim on which they prevailed by establishing immunity. In contrast, no other claim met both requirements, in part because no other claim involved a communication to an "agency of federal, state, or local government."[58] We hold that Bockwinkel and Coffey are entitled to reasonable attorney fees incurred to establish immunity on the IA claim, but not to fees incurred to prosecute or defend the many other claims made here.

2

Having held that the trial court had discretion to award fees on only one of many claims and counterclaims, we turn

---

[56] *McGreevy v. Or. Mut. Ins. Co.*, 128 Wn.2d 26, 35 n.8, 904 P.2d 731 (1995).

[57] Former RCW 4.24.510 (1989) (Laws of 1989, ch. 234, § 2) (emphasis added). The statute was amended in 1999 and 2002.

[58] If the defendants are contending that the website defamation claim involved communications to an agency of government, we reject that position. It involved communications to various individuals, none of whom was a government agency.

to whether the trial court exercised its discretion properly. The attorney for the individual defendants initially requested $98,105.50, the total "lodestar" amount incurred in defending the lawsuit.[59] The trial court directed him to segregate and reduce his request. He declined to do so, asserting that the court "needs to award a full lodestar . . . as these two defamation claims are not segregable."[60] After the court again ordered him to segregate, he submitted a new request for $77,627.50. Finally, on March 2, 2001, the court orally ruled in part:

> *I am not satisfied with the segregation.* I have invited twice segregation to occur, but I have sat through this case, and I know that there was significant amount of preparation for the prevailing parties, which . . . the defendants Coffey, Buckwinkle [sic] . . . and Richeson are entitled to as a matter of law under the statutory scheme.
>
> In looking at the totality of this billing—and it gets more and more segregated, *but it is clearly not the segregation that the Court wanted.* And in view of listening to the testimony, I find that I cannot piecemeal this, but I can state that I believe, in good faith, that there was [sic] some attorneys' fees expended to support their claims on which they won and they're entitled to. I will not go through item by item, and, if I am wrong, the court of appeals will tell me I am wrong and cannot do what I am about to do: I believe in the totality of the circumstances, without going inch by inch, because *it has not been sufficiently segregated,* although I wanted to, I will award to Defendants Coffey, Richeson and Buckwinkle [sic] a total of $50,000 in attorneys' fees.[61]

The court also declared that it would not enter a final judgment for fees until all claims had been resolved. On September 14, 2001, the trial court entered written findings

---

[59] CP at 2554.

[60] CP at 2552.

[61] Report of Proceedings (RP) (Mar. 2, 2001) at 16-17 (emphasis added).

of fact, one of which stated that "[t]he court is unable to segregate attorneys' fees."[62]

 ██ We review for abuse of discretion.[63] Abuse is shown "when [the trial court's decision] is manifestly unreasonable or based upon untenable grounds . . . ."[64] The trial court must create an adequate record for review of fee award decisions,[65] which means in part that the record must show a tenable basis for the award.

 "If attorney fees are recoverable for only some of a party's claims, the award must properly reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues."[66] This is true even if the claims overlap or are interrelated.[67] An exception exists, however, if " 'no reasonable segregation . . . can be made.' "[68] The burden of segregating, like the burden of showing reasonableness overall, rests on the one claiming such fees.[69] The Supreme Court has summarized as follows:

---

[62] CP at 174.

[63] *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987); *Mayer v. City of Seattle*, 102 Wn. App. 66, 79, 10 P.3d 408 (2000), *review denied*, 142 Wn.2d 1029 (2001).

[64] *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 148-49, 768 P.2d 998 (1989); *Mayer*, 102 Wn. App. at 79.

[65] *Mahler v. Szucs*, 135 Wn.2d 398, 435, 957 P.2d 632 (1998); *Mayer*, 102 Wn. App. at 79.

[66] *Mayer*, 102 Wn. App. at 79-80; *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 344, 54 P.3d 665 (2002); *Dash Point Vill. Assocs. v. Exxon Corp.*, 86 Wn. App. 596, 611, 937 P.2d 1148 (1997).

[67] *Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 411, 759 P.2d 418 (1988); *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 850, 726 P.2d 8 (1986); *Behr Process*, 113 Wn. App. at 344-45.

[68] *Mayer*, 102 Wn. App. at 80 (quoting *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 673, 880 P.2d 988 (1994), *cert. denied*, 513 U.S. 1112 (1995)).

[69] *Kastanis v. Educ. Employees Credit Union*, 122 Wn.2d 483, 501-02, 859 P.2d 26 (1993) ("plaintiff can be required to segregate its attorney's fees between successful and unsuccessful claims"); *Schmidt v. Cornerstone Inv., Inc.*, 115 Wn.2d 148, 171, 795 P.2d 1143 (1990) (fees denied because "the attorney fee declaration . . . does not segregate"); *Reninger v. Dep't of Corr.*, 79 Wn. App. 623, 640, 901 P.2d 325 (no fees where claimants failed to segregate), *aff'd*, 134 Wn.2d 437, 951 P.2d 782 (1995); *Malarkey Asphalt Co. v. Wyborney*, 62 Wn. App. 495,

If, as in this case, an attorney fees recovery is authorized for only some of the claims, the attorney fees award must properly reflect a segregation of the time spent on issues for which attorney fees are authorized from time spent on other issues. *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 450, 815 P.2d 1362 (1991); *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 410-11, 759 P.2d 418 (1988); *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 66, 738 P.2d 665 (1987); *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 744, 733 P.2d 208 (1987); *Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 849-50, 726 P.2d 8 (1986); *Kastanis v. Educational Employees Credit Union*, 122 Wn.2d 483, 859 P.2d 26 (1993).

> [T]he court must separate the time spent on those theories essential to [the cause of action for which attorney fees are properly awarded] and the time spent on legal theories relating to the other causes of action. . . . This must include, *on the record*, a segregation of the time allowed for the [separate] legal theories . . . .

*Travis*, 111 Wn.2d at 411. Where, however, the trial court finds the claims to be so related that no reasonable segregation of successful and unsuccessful claims can be made, there need be no segregation of attorney fees. *Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 447, 810 P.2d 952, 815 P.2d 812 (1991), *review denied*, 118 Wn.2d 1008 (1992).[70]

In this case, the trial court clearly believed segregation was possible. After sitting through the lengthy and vexatious proceedings, it twice demanded information from which it would be able to segregate.

In this case, the trial court never found that segregation was not reasonably possible. Noting that it had sat through the proceedings, and that it had twice demanded segregation, it orally commented that the IA claim "has not been sufficiently segregated;" although the defendants' total billings were getting "more and more segregated," they still did

---

514-15, 814 P.2d 1219 (1991) (defendants "shall segregate the time dedicated to the legal theories for which fees are allowed").

[70] *Hume*, 124 Wn.2d at 672-73 (emphasis added).

not reflect "the segregation that the Court wanted."[71] When it later found in writing that it "was unable to segregate," it was saying that the defendants had failed to furnish the necessary information, *not* that segregation was not reasonably possible.

In this case, segregation clearly was possible. The defamation claims were based on the events of November 1 and 2, 1996; the malicious prosecution claims on the federal proceeding commenced in December 1996 and April 1997; and the counterclaims on the state proceeding commenced in July 1998. At the core of each claim or type of claim was a different time and different facts, even though the facts overlapped in the sense that facts relevant on one were sometimes relevant to others as well. The record does not show that the claims were so interrelated as to excuse segregation. Nor will the record support a finding that $50,000 was reasonably incurred to establish a single defense (immunity) to a single claim (the IA defamation claim). This case embodied many claims and issues, and an award of nearly half the total fees incurred represents too high a proportion to be reasonable.

Based on these observations, we hold that the trial court was required to " 'include, on the record, a segregation of the time allowed for the [separate] legal theories.' "[72] It failed to do that, and thus abused its discretion. As a result, the award made here was arbitrary and not supported by the record. On remand, the trial court shall require the defendants to segregate (a) fees incurred to establish immunity on the IA defamation claim from (b) fees incurred on other claims and defenses. If the defendants fail or refuse to segregate, the trial court shall deny fees. If the defendants segregate in a way that the trial court finds partly but not wholly persuasive, the trial court may at its option "independently decide what represents a reasonable amount of attorney fees" incurred to establish immunity on the IA

---

[71] RP (Mar. 2, 2001) at 16-17.

[72] *Hume*, 124 Wn.2d at 673 (quoting *Travis*, 111 Wn.2d at 411).

defamation claim[73]—provided that it shows, *on the record,* a rational basis for its decision. Any award may include fees incurred on appeal, if any, to demonstrate immunity on the IA claim. We vacate the trial court's award of $50,000 in fees, with leave to redetermine that award on remand.

3

The defendants argue that the trial court was barred by law from "[h]olding statutorily mandated attorney fees hostage until some potential future retrial . . . ."[74] In other words, they contend that the court was required by law to enter an immediately enforceable judgment for fees before finally resolving the website defamation claim.

 Subject to one exception pertinent here, a court generally must resolve all claims for and against all parties before it enters a final and enforceable judgment on any part of the case.[75] The goals are to avoid confusion and piecemeal appeals.[76] For this reason, a final judgment is generally "the final determination of the rights of the parties in the action . . . ."[77]

The exception is found in CR 54(b). It provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, *the court may direct the entry of a final judgment as to one or more but fewer than all of the claims* or parties *only upon an express determination* in the judgment, supported by written findings, *that there is no just reason for delay* and upon an express direction

---

[73] *Mayer,* 102 Wn. App. at 79.

[74] Br. of Resp't at 77.

[75] *Kemmer v. Keiski,* 116 Wn. App. 924, 932, 68 P.3d 1138 (2003); *State v. Trask,* 91 Wn. App. 253, 265, 957 P.2d 781, 974 P.2d 1269 (1998), *review denied,* 137 Wn.2d 1020 (1999); *Matson v. City of Tacoma Civil Serv. Bd.,* 75 Wn. App. 370, 377, 880 P.2d 43 (1994).

[76] *See In re Dependency of E.L.F.,* 117 Wn. App. 241, 244, 70 P.3d 163 (2003); *Burton v. Clark County,* 91 Wn. App. 505, 513 n.9, 958 P.2d 343 (1998), *review denied,* 137 Wn.2d 1015 (1999).

[77] CR 54(a)(1).

for the entry of judgment. The findings may be made at the time of entry of judgment or thereafter on the court's own motion or on motion of any party. In the absence of such findings, determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

(Emphasis added.)

A trial court may utilize this exception only when the record will support the required findings.[78] Even then, however, a trial court has broad discretion on whether to split the case by entering two or more final judgments that are likely to generate multiple appeals and premature enforcement activity.[79]

The trial court in this case did not abuse its discretion by ruling that final judgment should await the resolution of all claims for and against all parties. The defendants did not propose the findings required by CR 54(b). Even if they had, moreover, there were and are at least three clear reasons to delay the entry of any final judgment until all claims against all parties have been resolved: (1) to offset judgments favorable to each side before any enforcement activity takes place; (2) to preclude the disruptive effects of enforcement and appellate activity while trial court proceedings are still ongoing; and (3) to avoid a multiplicity of appeals. The trial court did not err by declining to enter a final judgment until all claims for and against all parties have been resolved, and on remand it will again have discretion to do that.

---

[78] *Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 502, 798 P.2d 808 (1990); *Doerflinger v. N.Y. Life Ins. Co.*, 88 Wn.2d 878, 880, 567 P.2d 230 (1977); *Nelbro Packing Co. v. Baypack Fisheries, L.L.C.*, 101 Wn. App. 517, 522-23, 6 P.3d 22 (2000); *Pepper v. King County*, 61 Wn. App. 339, 345, 810 P.2d 527 (1991).

[79] *Schiffman v. Hanson Excavating Co.*, 82 Wn.2d 681, 687, 513 P.2d 29 (1973); *Lindsay Credit Corp. v. Skarperud*, 33 Wn. App. 766, 772, 657 P.2d 804 (1983).

## III

■ Loeffelholz and the County dispute the trial court's pretrial summary dismissal of their claims for malicious prosecution. The elements of such a claim are (1) that the malicious prosecution defendants initiated or continued a principal action, (2) that the malicious prosecution defendants acted without probable cause, (3) that the malicious prosecution defendants acted with malice, (4) that the principal action terminated in favor of the malicious prosecution plaintiff, and (5) that the principal action damaged the malicious prosecution plaintiff.[80] When the principal action is civil, the malicious prosecution plaintiff is sometimes required to prove (6) "special injury" and (7) "arrest of the person or seizure of property."[81] The malicious prosecution plaintiffs in this case are Loeffelholz and the County; the malicious prosecution defendants are Bockwinkel and Coffey; and the principal action was the civil one that Bockwinkel and Coffey pursued in federal court.

■ At trial, the malicious prosecution claimant has the burden of proving each necessary element.[82] But when a malicious prosecution defendant moves for summary judgment before trial, he or she "bears the initial burden of

---

[80] *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 497, 125 P.2d 681 (1942); *see also Hanson v. City of Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993); *Bender v. City of Seattle*, 99 Wn.2d 582, 593, 664 P.2d 492 (1983); *Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 962-63, 603 P.2d 828 (1979); *Hanson v. Estell*, 100 Wn. App. 281, 286, 997 P.2d 426 (2000); *Brin v. Stutzman*, 89 Wn. App. 809, 818, 951 P.2d 291, *review denied*, 136 Wn.2d 1004 (1998); *Pay 'N Save Corp. v. Eads*, 53 Wn. App. 443, 447, 767 P.2d 592 (1989); 16A DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE, § 21.2, at 45 (2d ed. 2000); *Clark v. Baines*, 114 Wn. App. 19, 30-55, 55 P.3d 1180 (2002) (Morgan, J., concurring and dissenting in part), *review granted*, 149 Wn.2d 1009 (2003).

[81] *Gem Trading*, 92 Wn.2d at 963; *see also Petrich v. McDonald*, 44 Wn.2d 211, 216, 266 P.2d 1047 (1954); *Manhattan Quality Clothes, Inc. v. Cable*, 154 Wash. 654, 657, 283 P. 460 (1929); *Abbott v. Thorne*, 34 Wash. 692, 694, 76 P. 302 (1904); *Baines*, 114 Wn. App. at 30-55 (Morgan, J., concurring and dissenting in part). *But see* RCW 4.24.350 (excusing these elements in some cases).

[82] *Peasley*, 13 Wn.2d at 498; *see Bender*, 99 Wn.2d at 593; *Baines*, 114 Wn. App. at 30-55 (Morgan, J., concurring and dissenting in part).

showing the absence of an issue of material fact."[83] Only if he or she meets this burden is the nonmoving party obligated to produce facts sufficient to show the presence of an issue of material fact.[84] Accordingly, the first issue here is whether Bockwinkel and Coffey bore their initial burden of showing the absence of a material issue of fact with respect to the absence of probable cause—or, when the double negatives are eliminated, whether Bockwinkel and Coffey showed as a matter of law (i.e., so clearly that reasonable minds could not differ) that they had probable cause to bring the federal case. If they did not show probable cause that clearly, its presence or absence must be decided by a trier of fact.

Bockwinkel and Coffey assert that they had probable cause as a matter of law because the federal judge ruled that the evidence produced in federal court was sufficient to submit the federal case to the federal jury.[85] In other words, as Loeffelholz and the County correctly point out, Bockwinkel and Coffey claim "that their ability to get past summary judgment indicates they had probable cause to bring the claim."[86]

The test for probable cause in Washington varies as between an informant and a probable-cause decision-

---

[83] *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *review denied*, 118 Wn.2d 1023 (1992).

[84] *Young*, 112 Wn.2d at 225.

[85] Quoting the federal judge's decision on sufficiency, they argue:

> The federal suit was supported by probable cause and attempts to dismiss Loeffelholz from the suit failed. The court let the excessive force issue concerning both Loeffelholz and Arends proceed to trial.

> The court has reviewed the evidence presented by [Bockwinkel and Coffey]. Although [Loeffelholz and Arends] state that they did not use excessive force, [*Bockwinkel and Coffey*] *have presented sufficient evidence supporting their claims*. A jury is required to resolve the differing versions of the truth ... The defendants' motion for summary judgment on this issue should be denied.

Br. of Resp't at 47-48 (quoting CP at 1025) (emphasis added in Br. of Resp't).

[86] Reply Br. of Appellants at 3.

maker.[87] The test for an informant is the one involved here because Bockwinkel and Coffey supplied the information on which the federal suit was based. For an informant to have probable cause, he or she must have made to the probable-cause decision-maker "a full and fair disclosure, in good faith, of all the material facts known to him [or her]," or, in alternative terms, he or she must have "fully and truthfully communicate[d] to the [decision-maker] all the facts and circumstances within his [or her] knowledge . . . ."[88] "It does not matter whether the informant knows a lot or a little, so long as the informant 'fully and truthfully communicates' whatever it is that he or she honestly and in good faith believes."[89] But he or she "can be liable if he or she lies or otherwise warps the truth in bad faith."[90]

■ A judge does not consider or apply this test when he or she rules that the evidence produced at trial is sufficient to take the case to the jury. The test for sufficiency is whether a rational trier of fact *could* find—not whether the trier *should* or *would* find—the fact contended for by the nonmoving party.[91] When applying that test, the judge must take the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[92] This is the same as to say that the judge must *assume*, not *assess*, the credibility of witnesses who favor the nonmoving party.

---

[87] *Baines*, 114 Wn. App. at 40, 46-47 (Morgan, J., concurring and dissenting in part).

[88] *Peasley*, 13 Wn.2d at 499-500; *see also Turngren v. King County*, 104 Wn.2d 293, 305-06, 705 P.2d 258 (1985); *Bender*, 99 Wn.2d at 594-96; *Baines*, 114 Wn. App. at 40-48 (Morgan, J., concurring and dissenting in part).

[89] *Baines*, 114 Wn. App. at 46 (Morgan, J., concurring and dissenting in part) (footnotes omitted).

[90] *Baines*, 114 Wn. App. at 46 (Morgan, J., concurring and dissenting in part).

[91] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *G.D. Searle & Co. v. Fed. Express Corp.*, 248 F. Supp. 2d 905, 907 (N.D. Cal. 2003).

[92] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Reassure Am. Life Ins. Co. v. Rogers*, 248 F. Supp. 2d 974, 981 (D. Haw. 2003).

When the federal judge ruled in the federal case at issue here, he determined that the federal jury *could* find that excessive force had been used. He did not rule that the jury should or would find that such force had been used, or that he himself believed such force had been used. In the absence of such findings, neither he nor the federal jury determined that Bockwinkel and Coffey had probable cause to bring the federal case because they had truthfully communicated the material facts known to them. The situation might be different if the federal jury had found for Bockwinkel and Coffey,[93] but it did not. The key issue with respect to probable cause was whether Bockwinkel and Coffey were telling the truth in good faith or lying in bad faith in the federal action;[94] that issue was not addressed when the federal judge found the evidence sufficient to go to the jury in the federal case; and Bockwinkel and Coffey have not borne their initial burden of showing probable cause as a matter of law. In more formal but confusing terms, Bockwinkel and Coffey have not shown the absence of a material issue of fact on the lack of probable cause merely because the federal judge submitted the federal case to the federal jury.[95]

## IV

■■■ The defendants claim that the trial court erred by dismissing counterclaims in which they alleged violations of 42 U.S.C. § 1983 and abuse of process.[96] With

---

[93] *Cf. Hanson,* 121 Wn.2d 552.

[94] For a more complete discussion of this proposition, see *Baines,* 114 Wn. App. at 40-48 (Morgan, J., concurring and dissenting in part).

[95] Nothing said herein precludes the trial court, on remand, from considering additional motions for summary judgment on Loeffelholz's and the County's claims for malicious prosecution. The only claim raised and briefed on appeal, and the only claim we have rejected, is that probable cause was established as a matter of law (i.e., so clearly that reasonable minds could not differ) merely because the federal judge submitted the federal case to the federal jury.

[96] Although the defendants also mention a counterclaim for negligence, they do not describe it, argue it, or cite any authority to support it. *See* Br. of Resp't at 71-72. Accordingly, we decline to consider it. *State v. Hoffman,* 116 Wn.2d 51, 71,

respect to § 1983, the defendants claim violations of "their First Amendment rights to petition the government for redress, freedom of speech and freedom of the press[,]"[97] merely because the plaintiffs sued for defamation. They do not cite any authority for the proposition that a party violates § 1983 merely by suing for defamation,[98] and we know of none. Moreover, the United States Supreme Court has held that a party does not offend First Amendment rights by suing a public figure for defamation if, as here, he or she is required to prove actual malice.[99] The trial court did not err by dismissing the § 1983 counterclaim.

With respect to abuse of process, the defendants claim that the evidence is sufficient to support findings on each essential element of the tort. But the "mere institution of a legal proceeding even with a malicious motive does not constitute an abuse of process."[100] Instead, " '[t]he gist of the action is the misuse or misapplication of the process, *after it has once been issued*, for an end other than that which it was designed to accomplish.' "[101] In other words, the action requires " 'a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any

---

804 P.2d 577 (1991) (court need not consider arguments not supported by authority); *Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co.*, 104 Wn. App. 597, 606, 17 P.3d 626 (2000) (same), *review denied*, 143 Wn.2d 1023 (2001).

[97] Br. of Resp't at 71.

[98] The defendants cite only *White v. State*, 131 Wn.2d 1, 929 P.2d 396 (1997) and *Right-Price Recreation*, 146 Wn.2d 370. In *White*, the plaintiff sued because her employer, the defendant, had allegedly altered her employment in retaliation for her having made a whistle-blower report. The evidence was insufficient to avoid summary judgment. The defendant had not sued the plaintiff, so the court did not consider or rule on whether a person can violate § 1983 merely by bringing a lawsuit. In *Right-Price Recreation*, the court found that the plaintiffs had failed to produce sufficient evidence of defamation and that the defendants were immune. The court did not consider or hold that the mere bringing of a defamation lawsuit violates § 1983.

[99] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[100] *Fite v. Lee*, 11 Wn. App. 21, 27-28, 521 P.2d 964, *review denied*, 84 Wn.2d 1005 (1974).

[101] *Batten v. Abrams*, 28 Wn. App. 737, 745, 626 P.2d 984 (quoting *Hoppe v. Klapperich*, 224 Minn. 224, 231, 28 N.W.2d 780 (1947)), *review denied*, 95 Wn.2d 1003 (1981).

formal use of the process itself, which constitutes the tort.' "[102] Although the evidence here shows "the mere institution of a legal proceeding," it shows nothing about process having been abused *after it has once been issued.*" The trial court did not err by dismissing this counterclaim.

## V

The next issue is whether the trial court erred by awarding costs and reasonable attorney fees to CLEAN under RCW 42.30.120(2). That statute is part of the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW. It provides, "Any person who prevails against a public agency in any action in the courts for a violation of this chapter shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action."

To analyze whether fees can be claimed under the OPMA, we address three questions. (A) When does it apply? (B) When it applies, what does it require? (C) When it applies but its requirements are not met, what consequences follow? We then apply the results to this case.

## A

■■ The OPMA applies only if several criteria are met. First, a "public agency" must be involved.[103] Examples include a state board or other state agency created by statute (other than the courts and the legislature); a county, city, or other political subdivision of the state; and any "subagency" created by statute, ordinance, or other legislative act.[104]

---

[102] *Batten*, 28 Wn. App. at 746 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 121, at 856-58 (4th ed. 1971)).

[103] *See* RCW 42.30.030 ("All meetings of the governing body *of a public agency* shall be open and public . . . .") (emphasis added); RCW 42.30.060(1) ("No governing body *of a public agency* shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public . . . .") (emphasis added).

[104] RCW 42.30.020(1).

■ Second, the public agency must be governed by a multimember board, commission, or similar body.[105] If the agency is governed by an individual, the OPMA does not apply.[106]

■ Third, the agency's governing body, or a committee thereof, must hold a "meeting" at which the body or committee has the ability to "transact official business."[107] If the body or committee lacks a quorum, the OPMA does not apply.[108]

■ Fourth, the agency's governing body, or a committee thereof, must hold a meeting at which it actually "transacts official business."[109] If it holds a meeting without transacting such business, the OPMA does not apply.[110]

---

[105] See RCW 42.30.030 ("All meetings *of the governing body* of a public agency shall be open and public . . . .") (emphasis added); RCW 42.30.060(1) ("No *governing body* of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public . . . .") (emphasis added); RCW 42.30.020(2) (" *'Governing body' means the multimember board, commission, committee, council, or other policy or rule-making body* of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment.") (emphasis added).

[106] *Salmon For All v. Dep't of Fisheries*, 118 Wn.2d 270, 276-77, 821 P.2d 1211 (1992).

[107] See RCW 42.30.030 ("All *meetings* of the governing body of a public agency shall be open and public . . . .") (emphasis added); RCW 42.30.060(1) ("No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a *meeting* open to the public . . . .") (emphasis added); RCW 42.30.020(4) ("Meeting" means a meeting "at which action is taken."); RCW 42.30.020(3) (" 'Action' means the transaction of the official business of a public agency by a governing body . . . .").

[108] *Wood*, 107 Wn. App. at 564 (OPMA "not violated if less than a majority of the governing body meet"); *In re Recall of Beasley*, 128 Wn.2d 419, 427, 908 P.2d 878 (1996) (OPMA not violated "if fewer than a majority meet together on any one occasion").

[109] See RCW 42.30.030 ("All meetings of the governing body of a public agency shall be open and public . . . ."); RCW 42.30.060(1) ("No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public . . . ."); RCW 42.30.020(4) ("Meeting" means a meeting *"at which action is taken."*) (emphasis added); RCW 42.30.020(3) (" *'Action' means the transaction of the official business* of a public agency by a governing body . . . .") (emphasis added).

[110] *Miller v. City of Tacoma*, 138 Wn.2d 318, 325, 979 P.2d 429 (1999) (city council "took action" in executive session); *Estey v. Dempsey*, 104 Wn.2d 597, 604, 707 P.2d 1338 (1985) (" 'Action' means the transaction of the official

## B

When the OPMA applies, it requires that "[a]ll meetings of the governing body of a public agency . . . be open and public and all persons . . . be permitted to attend . . . , except as otherwise provided in this chapter."[111] The governing body may not adopt "any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter."[112] And, anyone may attend such meeting without being required "to register his name and other information, to complete a questionnaire, or otherwise to fulfill any condition precedent to his attendance."[113]

## C

When the OPMA applies but its requirements are not met, several consequences may ensue. A claimant may recover a civil penalty of $100 against each member of the agency's governing body who knew the meeting was being held in violation of the OPMA.[114] A claimant who prevails against the agency may recover reasonable attorney fees and costs.[115] The "action" taken at the "meeting" may be

---

business . . . and does not automatically occur when a majority of the members of a governing body gather together, RCW 42.30.070."); *Schmitt v. Cape George Sewer Dist. No. 1*, 61 Wn. App. 1, 7, 809 P.2d 217 (1991) ("Although it appears that some discussion occurred at the February 28 meeting . . . , the commissioners took no formal action . . . ."); *In re Recall of Roberts*, 115 Wn.2d 551, 554, 799 P.2d 734 (1990) ("A majority of the members of a governing body are not prohibited from gathering together for purposes other than a regular or special meeting, so long as they take no 'action.' ").

[111] RCW 42.30.030.

[112] RCW 42.30.060(1).

[113] RCW 42.30.040.

[114] RCW 42.30.120(1); *Wood*, 107 Wn. App. at 558.

[115] RCW 42.30.120(2); *Protect the Peninsula's Future v. Clallam County*, 66 Wn. App. 671, 678, 833 P.2d 406 (1992), *review denied*, 121 Wn.2d 1011 (1993).

"null and void,"[116] and a continuing or threatened violation may be enjoined.[117]

## D

In this case, the election workers were not the "governing body" of a "public agency." They were not organized, by statute or any other provision of law, into either a "public agency" or a "governing body." As a matter of law, they could not have held a "meeting" to which the OPMA applied.

In this case, the Pierce County Auditor's Office was a public agency that lacked a "governing body" of the type described in the OPMA. It was controlled by a single individual, the independently elected auditor, and not by a "multimember board, commission, committee," or the like.[118] Thus, it could not have held a "meeting" to which the OPMA applied.

In this case, the county canvassing board was a "public agency" that had a "governing body." But even when viewed in the light most favorable to CLEAN, the record does not show that a majority of the board's members ever met, or, if they met, that they ever took "action" (i.e., transacted official business). Nor does the record show that the board ever divided itself into committees, that one of its committees ever "met," or that any such committee ever took "action." The record is factually insufficient to support a finding that the canvassing board's "governing body," or a committee thereof, held a "meeting" to which the OPMA applied; and without such a finding, the OPMA does not apply.

---

[116] RCW 42.30.060(1).

[117] RCW 42.30.130.

[118] *See* RCW 42.30.020(2); *Salmon For All*, 118 Wn.2d at 276-77.

Emphasizing the canvassing board's authority to delegate most tasks,[119] CLEAN asserts, in effect, that the canvassing board delegated to seasonal election workers its authority not just to "remake" ballots when the voter's intent was clear, but also its authority to convene and hold "meetings" within the meaning of the OPMA. CLEAN then asserts or assumes that the election workers held "meetings" to which the OPMA applies.

■ We reject these assertions. Even assuming that the required majority of such workers somehow "met"—an assumption wholly without foundation in the record—their "meeting" could not be subject to the OPMA unless it was the "meeting" of the "governing body" of a "public agency;"[120] they could not be a "governing body" unless they had policy-making or rule-making authority;[121] and nothing in the record shows that they had policy-making or rule-making authority. Accordingly, CLEAN cannot rely on the OPMA in this case.

Before ending this part of our discussion, we caution that nothing herein means that the process of "remaking" absentee ballots need not be public.[122] We hold only that the "governing board" of a "public agency" did not hold a "meeting;" that in the absence of such a "meeting" the OPMA does not apply; and that because the OPMA does not apply, the trial court erred by awarding fees and costs under RCW 42.30.120(2).

---

[119] Former RCW 29.62.015(3) ("The county canvassing board may . . . delegate in writing, or at a public meeting, the performance of any task assigned by law to the board.") (Laws of 1995, ch. 139, § 1).

[120] See RCW 42.30.030, .060.

[121] RCW 42.30.020(2); *Refai v. Cent. Wash. Univ.*, 49 Wn. App. 1, 13, 742 P.2d 137 (1987) (faculty committee was not "governing body" due to lack of policy-making authority), *review denied*, 110 Wn.2d 1006 (1988). *Compare Cathcart v. Andersen*, 85 Wn.2d 102, 107, 530 P.2d 313 (1975) (faculty was "governing body" where it had policy-making authority). In neither of these cases was it disputed that a meeting had been held. In our case, by way of contrast, the evidence does not show that a meeting was ever held *or* that those participating had policy-making authority.

[122] *E.g.*, RCW 29.54.025(1) (proceedings at counting center "shall be open to the public"); *see also* WAC 434-261-010, effective November 13, 1997.

## VI

The defendants raise several additional issues. They argue that the trial court erred (A) by declining to impose sanctions for discovery violations and alleged misconduct by plaintiffs' counsel, (B) by excluding any mention of the auditor's history of false swearing, (C) by not telling the jury that the IA claim had been dismissed, and (D) by not granting postverdict relief for several remarks made by plaintiffs' counsel during closing argument.

## A

The defendants complain about the trial court's denial of their motions to impose sanctions for discovery violations. They argue that the County did not produce, or produced tardily, (1) Loeffelholz's personnel file; (2) a tape of Bockwinkel and Coffey's conversation with Lt. Reed on November 1, 1996 (hereafter "the IA tape"); and (3) a tape of Lt. Bisson's later investigatory interview of Loeffelholz (hereafter the Bisson-Loeffelholz tape).[123]

A trial court has discretion when asked to impose sanctions for discovery violations. We review only for abuse of that discretion.[124] Thus, the issue here is whether the trial court abused its discretion by not imposing sanctions; or, put another way, whether the trial court was not just permitted, *but also required*, to impose sanctions.

The trial court was not required to impose sanctions for the County's concededly late production of the personnel file. The County produced the entire file just before trial,

---

[123] The defendants also argue that the County did not produce tapes of other interviews by Lt. Bisson and the identities of 30 election workers who were at the warehouse on October 31, 1996. We cannot find anywhere in the record where the defendants called these items to the trial court's attention, and we decline to consider discovery problems that were not called to the trial court's attention. RAP 2.5(a); *State v. Long*, 58 Wn.2d 830, 834, 365 P.2d 31 (1961), *cert. denied*, 374 U.S. 850 (1963); *Bank of Am. NT & SA v. David W. Hubert, P.C.*, 115 Wn. App. 368, 384, 62 P.3d 904 (2003).

[124] *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 684, 41 P.3d 1175 (2002); *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

and no one admitted the file during trial. The trial court found, and the record supports, that the defendants were not prejudiced. The trial court had discretion either to grant or deny sanctions, and it did not abuse its discretion by denying them.

The trial court was not required to impose sanctions for the County's concededly late production of the IA tape.[125] On April 30, 1997, Bockwinkel testified in a deposition that she and Coffey had a copy of the IA tape, which she, Bockwinkel, had "listened to."[126] Early on, as far as we can tell, both sides had a transcript of the tape. By August 14, 2000, it was clear that even though the tape was not available, the transcript was. On August 17, 2000, the trial court ruled that the transcript could be used before the jury. On August 21, 2000, the County finally found and disclosed the tape. Several days of trial remained, but no one— neither the defendants nor the plaintiffs—ever elected to use either the tape or the transcript in front of the jury. The tape was most relevant, though not exclusively so, to the IA claim that was finally dismissed on other grounds. The trial court found, and the record supports, that the County acted in good faith notwithstanding its tardiness, and that the defendants were not prejudiced.[127] The trial court had discretion either to grant or deny sanctions, and it did not abuse its discretion by denying them.

---

[125] Defendants assert that the County's counsel "concealed" the tapes and the file, and thus that the County's counsel engaged in willful misconduct. Br. of Resp't at 64. The trial court did not make any such findings.

[126] CP at 3412. The deposition was published on August 21, 2000.

[127] On August 23, 2000, at the end of the plaintiffs' case in chief, the trial court orally summarized as follows:

I believe we do not have the inevitable tape in evidence. And I also rule that the sanctions or whatever we've talked about for the last ten days on this discovery issue is of no concern to me.

You've got the tape; you've had the transcript the whole time. I want to make it clear if I haven't. I don't think there's any bad faith. I think you have the tape now. Neither side used this transcript.

And anything that you can say about lack of discovery, you've got the tape;

The trial court was not required to impose sanctions for the County's nonproduction of the Bisson-Loeffelholz tape. The record shows that the County disclosed a transcript of that tape early on; that the defendants used that transcript to impeach Loeffelholz;[128] and thus that the defendants were not prejudiced by the absence of the tape itself. The defendants first noted the absence of this tape *after* the verdict. The trial court found that the County acted in good faith despite its tardiness. The trial court had discretion either to grant or deny sanctions, and it did not abuse its discretion by denying them.[129]

## B

The defendants argue that the trial court erred by "excluding any mention of the Auditor's history of false swearing."[130] They assert that "[u]nder ER 609(a)(2), evidence of crimes involving dishonesty or false statement must be admitted when offered; the trial judge has no discretion."[131]

■ The defendants mistake the applicable rule. ER 608(b) provides in part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness . . . .

ER 609(a)(2) provides in part:

---

you've had the transcript the whole time.

. . . .

We got the tape. The tape was before us. The tape became a nonissue here and I've ruled as a matter of law. I don't want to hear another word about discovery.

RP at 1130-33.

[128] *See* RP at 982, 994.

[129] We reject the defendant's reliance on *Fisons*, 122 Wn.2d 299. The circumstances there were much more egregious than those here.

[130] Br. of Resp't at 73.

[131] Br. of Resp't at 74. *See State v. Newton*, 109 Wn.2d 69, 79, 743 P.2d 254 (1987).

> For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted . . . if the crime . . . involved dishonesty or false statement, regardless of the punishment.

ER 608 applies when *nonconviction* evidence is offered to attack a witness' character for truthfulness, while ER 609 applies when *conviction* evidence is offered to attack a witness' character for truthfulness.

 In this case, the defendants never offered to prove that the auditor had been *convicted* for perjury or false swearing. Rather, they offered to prove two specific instances of *nonconvicted* conduct—that the auditor had falsely represented her education in a voter's pamphlet, and that the auditor had falsely testified about her education in an unrelated case.[132] The applicable rule was ER 608(b), not ER 609(a)(2); the trial court had broad discretion to admit or exclude the specific instances of nonconvicted conduct that the defendants were offering; and the trial court did not abuse its discretion by excluding those specific instances.

## C

The defendants complain in two ways about how the trial court told the jury that the IA claim had been dismissed. The court erred, they assert, (1) by failing to instruct the jury that the IA claim had been dismissed, and (2) by prohibiting their counsel from informing the jury during his closing argument that the IA claim had been dismissed.

 The first argument fails because the defendants did not propose an instruction that would have told the jury that the IA claim had been dismissed. Nor did they object when the court actually instructed, "[T]here are some issues that the court considered. You have the remaining

---

[132] RP at 1091-92.

issues."[133] For both reasons, the first argument has not been preserved for review.

▇ The second argument fails for lack of merit. Counsel had a right to comment on the issues that the jury *was* to decide. He did not necessarily have a right to comment on issues that the jury *was not* to decide. If the trial court had allowed him to comment on issues the jury *was not* to decide, it would have generated a real and substantial danger that closing arguments would run amok, given the obviously vexatious nature of the case. The trial court did not abuse its discretion by limiting closing arguments as it did.

## D

The defendants make several additional complaints about the closing arguments. They argue that the County's counsel should not have been allowed to refer (1) to the IA complaint that Bockwinkel and Coffey had made to Reed, (2) to the IA tape, or (3) to Bockwinkel and Coffey as "trespassers."

▇ Preliminarily, none of these alleged errors was preserved for review, for none was the subject of a timely objection. The same result follows, however, if we briefly consider other grounds.

Error did not occur when the County's counsel referred to the IA complaint. Counsel was arguing malice[134] and credibility,[135] both being relevant matters then before the jury. Defense counsel argued similarly.[136]

---

[133] RP at 1365.

[134] *E.g.*, RP at 1375 (arguing the IA complaint as evidence of Bockwinkel's and Coffey's hostility toward Loeffelholz).

[135] *E.g.*, RP at 1381 ("Did you believe [them] when they went to Internal Affairs and said, 'Gee, Internal Affairs? I didn't know it was Internal Affairs.' ").

[136] RP at 1429 ("They went and they told I.A. . . . that this had happened. They tried to file an assault charge against Billy Joe Arends and they wouldn't let them.").

■■ Error did not occur or was invited when the County's counsel, in his rebuttal closing argument, referred to the IA tape that was never put before the jury by either side. The County's counsel was responding to *defense* counsel, who had just told the jury:

They went and they told I.A., they told the sheriff's department that this had happened. They tried to file an assault charge against Billy Joe Arends and they wouldn't let them. But they took their statements, which plaintiff did not let you *hear*. They didn't bring those statements in.[137]

In rebuttal, the plaintiffs' counsel responded:

They've got the tape. If it was such hot stuff for them, why didn't they bring it?

We don't have to because we've got the written document that says what their complaint was. We've got the documents from the officers and the people that handled it, to show you that these people didn't cooperate at all with this Internal Affairs investigation, if they really wanted to bring it. They didn't. They just wanted to cause trouble for Officer Loeffelholz.[138]

By plainly referring to the IA tape, defense counsel "opened the door" on that subject and gave the County a right to argue its side of the same issue. That the County responded within these parameters is manifested by defense counsel's failure to object at the time. There was no error or, if error be assumed, it was invited (i.e., the door had been opened).

■■ Error did not occur or was harmless when the County's counsel referred to Bockwinkel and Coffey as trespassers. As the defendants correctly emphasize, the trial court earlier had precluded counsel from mentioning, during their closing arguments, a *federal judge's* opinion, uttered during the federal suit, that the two women were trespassers in the warehouse. But the parties also *had stipulated* to the admission of exhibit 134, in which Lt. Bisson had "conclude[d] that Ms. Coffey and Ms. Bock-

---

[137] RP at 1429 (emphasis added).

[138] RP at 1443.

winkel did violate RCW 9A.52.070 Criminal Trespass 1 by entering and remaining on the premises of a secured facility without the proper authorization and refusing to leave when ordered to do so by . . . Loeffelholz."[139] Pursuant to their stipulation, this exhibit was admitted and went to the jury room during deliberations. The reference now complained of added nothing to what the jury already had, it could not have affected the verdict, and it was harmless under these circumstances.

Any arguments or assertions not herein discussed lack merit or need not be reached.

The trial court's orders on the website defamation claim are affirmed, and the damages portion of that claim is remanded for new trial. The trial court's dismissal of the malicious prosecution claims is reversed, and those claims are remanded for further proceedings. The trial court's order granting fees and costs under RCW 42.30.120(2) is reversed. The trial court's order granting fees and costs under RCW 4.24.510 is reversed and remanded for redetermination (including such fees and costs incurred on this appeal), provided that the record developed on remand discloses a rational basis for segregating fees and costs reasonably incurred on the IA claim from fees and costs incurred on other claims. In all other respects, the trial court's judgment is affirmed.

BRIDGEWATER and ARMSTRONG, JJ., concur.

After modification, further reconsideration denied March 2, 2004.

---

[139] Ex. 134, at 3.