[No. 44775-1-I. Division One. July 17, 2000.]

KURTIS R. MAYER, ET AL., *Appellants*, v. THE CITY OF SEATTLE, ET AL., *Respondents*.

68

*Warren J. Daheim* and *Bradley B. Jones* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), for appellants.

*John E. Lenker; John C. Bjorkman* and *Helen B. Moure* (of *Preston Gates & Ellis*); *William T. Willard*; and *Mark H. Sidran, City Attorney,* and *Peter E. Hapke, Assistant,* for respondents.

APPELWICK, J. — Kurtis Mayer sued the respondents in tort and for violations of Washington's Model Toxics Control Act (MTCA), when toxic cement kiln dust was discovered on property where Mayer wished to construct a road. A genuine issue of material fact exists regarding when Mayer reasonably should have known that the property was contaminated. Therefore, the trial court erred in ruling as a matter of law that the statute of limitations on the tort claims had expired. Further, the court abused its discretion in awarding Mayer $274,302.05 in attorney fees on the MTCA claim. Therefore, we reverse and remand both the summary judgment order and the attorney fees award.[1]

## FACTS

In 1978, real estate developer Kurtis Mayer purchased a 10-acre piece of property (the "Pigeon Point" property) in a heavily wooded and isolated area of West Seattle. Pigeon Point is located adjacent to Puget Park and 100 yards north of a piece of property owned by John McFarland. The City of Seattle (City) owns Puget Park, which consists of 17.6 acres of undeveloped greenbelt. The primary access to Mayer's property and Puget Park is a narrow winding road known as Puget Way Southwest, which crosses McFarland's property.

Respondent Holnam, Inc. and its predecessor, Ideal Cement Company, manufactured cement at a plant located near the properties in question.[2] Cement kiln dust, commonly referred to as "CKD," is a waste byproduct of cement

---

[1] During the course of this appeal, Mayer filed a motion to strike portions of each of the cross-appellants' reply briefs. Mayer argued that the cross-appellants improperly devoted portions of their briefs to Mayer's tort claims appeal. We will not address the motion in a formal order. But in deciding this appeal, we have not considered matters that the parties improperly raised.

[2] Since this lawsuit began, Holnam has sold its plant.

manufacture. The pH and metals content in CKD varies widely among cement manufacturers. If the CKD's pH exceeds 12.5 or if it contains elevated metals, CKD will designate as a dangerous waste. *See* WAC 173-303--070(3)(a)(iii), -090(6)(a)(iii), -090(8)(a).

In approximately 1969, Ideal contracted with third parties to remove CKD from the Ideal plant. In the late 1960s and early 1970s, approximately 50,000 cubic yards of CKD from the Ideal plant were placed as fill into a ravine located in Puget Park and onto McFarland's property. Mayer does not allege that his property is contaminated by CKD. The City authorized the CKD dumping.

Aerial photographs of Puget Park and McFarland's property taken in 1978 and 1980 document that the CKD fill was clearly visible at that time. The fill is a powdery material with a white to off-white color and is dissimilar in color to soils in the area. Referring to the photographs, McFarland testified that the fill was visible to anyone walking or driving along Puget Way Southwest at the time the pictures were taken. Mayer claims he was not aware of any unnatural fill materials on Puget Way Southwest, the McFarland property, or Puget Park when he purchased Pigeon Point in 1978.

Between 1978 and 1992, Mayer obtained several assessments of his property, the access road, and the surrounding area, in preparation for development. The record contains copies of several of these reports. Many of the reports express concerns about soil stability and the need for improvements to Puget Way Southwest. But none of them addresses the chemical composition of the fill material.

On January 15, 1988, McFarland filed suit against the City and his neighbors to quiet title to Puget Way Southwest. Mayer intervened in the action. On January 31, 1992, Mayer, the City and McFarland entered into a settlement agreement of the quiet title action. The agreement provided for title to be quieted in the City to an expanded right-of-way along the existing route of Puget Way Southwest. Mayer was to submit a proposal for construction of a road

along the expanded right-of-way, and apply for a permit from the City. McFarland wished to realign a portion of the roadway over his property. He was given the right under the settlement agreement to submit a proposal for the realignment.

In 1990, Mayer took McFarland's deposition in connection with the quiet title action. McFarland testified in the deposition that "fly ash from the cement plant" had been placed in a fill area on his property in about 1968 to 1969. But McFarland did not indicate any concerns about the toxicity of the "fly ash."

On January 23, 1992, Mary Pfender from the City wrote to Mayer and McFarland's engineer, commenting on the proposal for both the existing roadway alignment and McFarland's proposed realignment. Pfender requested "[g]eotechnical stud[ies]" for both alignments. Pfender's concern expressed in the letter was the stability of the surrounding terrain: she wrote, "In general, our objective is to end up with a pavement designed to hold up over time given the roadbed soil conditions and to ascertain that the slopes above and below the right of way will be stable on completion of the road." Pfender also requested additional information "due to the unknown composition and characteristics of the fill on which the relocated roadway would be built." She requested a soil boring in the fill area to determine the "characteristics and depth of the fill" as well as its "composition." She further stated, "If the fill is fly ash, check with [the Washington State Department of Ecology ("Ecology")] to see if there are any special requirements for construction of a road over fly ash." Neither Mayer nor McFarland contacted Ecology as Pfender requested.

In response to Pfender's letter, Mayer and McFarland retained Dames & Moore to conduct a "geotechnical" investigation of the existing roadway and proposed realignment. In a written report, Dames & Moore expressly identified the presence of the "white ash" fill on McFarland's property and noted that Mayer's proposed road alignment was at least "partly on the low-density fill placed by McFarland." Dames

& Moore concluded that the "white ash" was unsuitable for a road base because it was uncompacted.

When the City required additional geotechnical work in 1993, Mayer hired GeoGroup Norwest, Inc. (GeoGroup). As GeoGroup's William Chang attested, GeoGroup discovered that the fill material was in fact cement kiln dust:

> At the time of the Dames & Moore report, the material had only been identified as "white ash." At some point after the Dames & Moore study, while we were preparing our geotechnical study, we became aware that the material was in reality cement kiln dust.
>
> Because of the volume of cement kiln dust encountered in the alternative right-of-way and our knowledge that the material was cement kiln dust which we suspected to be caustic, I felt it appropriate to conduct a single pH litmus paper test of the material.

The litmus paper test revealed that the fill material had a high pH of about 13; this result was presented in GeoGroup's December 1993 report.

In the meantime, the City had tested the CKD fill material in Puget Park and determined that it contained dangerous levels of lead and arsenic. On March 29, 1994, Pfender wrote to Mayer disclosing this information. Pfender stated that the fill on the Puget Way Southwest roadway was likely similar to the fill in Puget Park. Pfender wrote, "[u]nless the developer removes the cement ash or provides the City with assurances that it will not be exposed to a future environmental lawsuit or enforcement action, the City cannot accept the roadway."

In response to Pfender's letter, the City, McFarland and Mayer jointly selected RZA AGRA, a nationally known environmental consulting firm, to perform the required environmental site assessment. By early July 1994, RZA AGRA reported its initial findings of exceedingly high levels of toxic heavy metals, up to 20 times above applicable human health safety standards, in Puget Park, the McFarland property, and Puget Way Southwest. Mayer

claims that this is the first time he knew that the fill material along Puget Way Southwest was contaminated. Pursuant to WAC 173-340-300, Mayer reported the contamination to Ecology. On November 8, 1994, Ecology informed Mayer that the roadway, Puget Park and McFarland's property were all one "site" for cleanup and liability purposes under the Model Toxics Control Act (MTCA), chapter 70.105D RCW.

Effective April 16, 1995, Mayer sued Holnam, the City and McFarland under theories of nuisance, negligence, strict liability and negligence per se. Mayer alleged that the defendants' creation and maintenance of a toxic waste dump in Puget Park and along Puget Way Southwest impacted Mayer's ability to develop his property. On March 15, 1996, Mayer amended his complaint to allege that defendants were strictly, jointly and severally liable to him under MTCA for all remedial action costs incurred as a consequence of the CKD dumping. McFarland, the City and Holnam have since completed an independent remedial action of the CKD site.

Before filing his tort lawsuit, Mayer negotiated a partially contingent fee agreement with his attorneys. Rather than their usual hourly rates of up to $200 per hour, Mayer's attorneys charged him $75 per hour plus a percentage of the tort damages Mayer would potentially recover.

The defendants jointly moved for summary judgment dismissal of the majority of Mayer's common law tort claims on statute of limitations grounds. The court granted the motion. The court ruled, as a matter of law, that Mayer had notice of all facts sufficient to prompt a person of average prudence to inquire about the fill material at least by the time he received Pfender's January 23, 1992, letter. The court also ruled that the City and McFarland were strictly liable property owners under MTCA. Holnam agreed not to contest its MTCA liability. The court awarded Mayer $26,314.28 in remedial action costs, $238,702.50 in attorney fees and $35,599.55 in litigation costs under MTCA.

Mayer now appeals the trial court's summary judgment

order. The respondents Holnam, McFarland and the City cross-appeal the MTCA attorney fees award.

## STATUTE OF LIMITATIONS

Mayer contests the trial court's order dismissing his tort claims on summary judgment due to the running of the statute of limitations. A genuine issue of material fact exists regarding when Mayer reasonably should have known that the fill material was toxic. Thus, the court erred in dismissing the tort claims on summary judgment.

■ An order of summary judgment is reviewed de novo by the reviewing court. *Benjamin v. Washington State Bar Ass'n*, 138 Wn.2d 506, 515, 980 P.2d 742 (1999). The motion should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 515. The court must consider the facts in the light most favorable to the nonmoving party. *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998).

■ Mayer sued in tort for nuisance, strict liability (abnormally dangerous activity), and negligent injury to real property. There is no specific statute of limitations governing Mayer's claims; thus, they are subject to the two-year catchall period. *See* RCW 4.16.130; *In re Hanford Nuclear Reservation Litig.*, 780 F. Supp. 1551, 1574 (E.D. Wash. 1991) (Washington's two-year limitations period governs nuisance claims); *White v. King County*, 103 Wash. 327, 329, 174 P. 3 (1918) (two-year limitation applies to negligent injury to real property). Mayer argues for the first time in his reply brief that his nuisance claim is not barred by the statute of limitations because the nuisance was continuing or abatable. Because this argument was not raised before the trial court, we decline to consider it. *See* RAP 2.5(a); RAP 9.12.

■■ The statute of limitations begins to run when the plaintiff's cause of action accrues. RCW 4.16.005. Generally, this occurs when the plaintiff suffers some form of injury or damage. *Crisman v. Crisman*, 85 Wn. App. 15, 20,

931 P.2d 163 (1997). The injury or damage must be "actual and appreciable" before the statute of limitations will begin to run. *Haslund v. City of Seattle*, 86 Wn.2d 607, 620, 547 P.2d 1221 (1976).

In cases where a delay occurs between the injury and the plaintiff's discovery of it, the court may apply the discovery rule. *Crisman*, 85 Wn. App. at 20. The discovery rule will postpone the running of a statute of limitations until the time when a plaintiff, through the exercise of due diligence, should have discovered the basis for the cause of action. *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992). Once the plaintiff has notice of facts sufficient to prompt a person of average prudence to inquire into the presence of an injury, he or she is deemed to have notice of all facts that reasonable inquiry would disclose. *Vigil v. Spokane County*, 42 Wn. App. 796, 800, 714 P.2d 692 (1986). Whether the plaintiff has exercised due diligence under the discovery rule is a question of fact. *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 539, 871 P.2d 601 (1994). Because the statute of limitations is an affirmative defense, the burden is on the defendant to prove those facts that establish the defense. *Haslund*, 86 Wn.2d at 620-21.

■ A landowner's claim for damage from contaminated property accrues when he or she becomes aware, or should have become aware, that the property was contaminated. *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1581 (9th Cir. 1994). This is because the landowner will know at that time that the value of the property is likely diminished. *See Id.* at 1581. Although Mayer is not the owner of the land where the toxic fill is located, the *Louisiana-Pacific* rule applies in this case. The statute of limitations was triggered the moment Mayer knew or should have known that the CKD fill material along Puget Way Southwest was toxic, because at that point Mayer should have known that the material's toxicity would impede his attempts to develop his property.

■ Viewing the facts in the light most favorable to Mayer, we conclude that Mayer knew or reasonably should

have known about the toxicity of the fill material no earlier than the date when William Chang of GeoGroup reported the results of his litmus test. Chang was the first person to perform a litmus test of the fill material. The test results revealed that the material was highly alkaline to a degree that would cause the material to designate as a hazardous waste under MTCA. GeoGroup reported the results of the litmus test in December 1993, less than two years before Mayer filed the lawsuit.

The trial court found that the statute of limitations began to run at least by the time Mayer received Mary Pfender's letter dated January 23, 1992. But Pfender's letter did not raise concerns about the possible toxicity of the fill material. The letter focused instead on soil and slope stability. Pfender did request that Mayer contact Ecology to determine if the agency had special requirements for building a road over "fly ash." The respondents claim that this vaguely-worded directive was a warning to inquire whether the material presented an environmental management or cleanup problem. The respondents further claim that if Mayer had contacted Ecology, that agency would have directed him to test the material to determine if it had a dangerously high alkalinity or high levels of heavy metals.[3] But it is speculative to conclude that if Mayer had contacted Ecology regarding the agency's "requirements for construction of a road over fly ash," the agency would have directed Mayer to perform a chemical analysis of the material. There is no direct proof for this assertion in the record. For instance, the respondents might have obtained testimony from an Ecology employee regarding how he or she would have responded to a developer's questions about constructing a road over fly ash. The respondents failed to offer this kind of direct evidence. Thus, there is a genuine issue of

---

[3] Ecology had in 1992 and still has, specific regulations for the sampling and testing of "[f]ly ash-like material" for "[c]orrosivity" (high pH) and to determine whether the material is a "dangerous waste." WAC 173-303-110(2)(a)(iii) and (3)(a)(ii) (1992) and (1997). Ecology also had a test for determining whether the arsenic or lead content of a solid waste caused the waste to be a regulated "dangerous waste." WAC 173-303-090(8)(a), (c) (1992).

material fact regarding whether the Pfender letter was sufficient to cause a reasonably prudent developer to inquire into the toxicity of the fill material. The trial court erred in ruling as a matter of law that the statute of limitations began to run when Mayer received the letter.

The respondents' argument that Mayer had knowledge of facts sufficient to make a prudent person inquire into the chemical composition of the fill material at least by the time of McFarland's deposition, is also unpersuasive. McFarland testified in his 1990 deposition that fill material from the cement plant had been dumped on his property along Puget Way Southwest. But even if this information should have alerted Mayer to the presence of CKD along Puget Way Southwest, this does not mean that Mayer should have known that the fill material was toxic. CKD is not necessarily toxic. Again, Mayer suffered injury only when he first learned, or should have learned, that the property was contaminated with toxic material. *See Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1581 (9th Cir. 1994).

Finally, the respondents argue that Mayer should have known that the fill material was toxic when he first purchased the property, because public documents from the late 1960s and early 1970s reported the CKD dumping. We have no reason to question Mayer's assertion that it would not be common practice for a developer to check these kinds of records. Even assuming that Mayer had a duty to consult the records, there is no indication that he should have known that their vague references to the alkalinity of the fill in Puget Park would have affected his ability to develop the road along Puget Way Southwest.

## ATTORNEY FEES

In their cross-appeal, the respondents/cross-appellants contest the trial court's MTCA attorney fees award. We hold that the attorney fees award was an abuse of discretion.

■ MTCA provides for recovery of reasonable attorney fees to a prevailing party in a private cause of action. RCW

70.105D.080. The amount of a fee award is discretionary, and will be overturned only for manifest abuse of discretion. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds, or if no reasonable person would take the position adopted by the trial court. *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 148-49, 768 P.2d 998, 773 P.2d 420 (1989).

 ██ Courts should apply the lodestar method in calculating an award of reasonable attorney fees. *Mahler v. Szucs*, 135 Wn.2d 398, 433, 957 P.2d 632 (1998). Under the lodestar method, the court multiplies the total number of attorney hours reasonably expended by the reasonable hourly rate of compensation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983). In some circumstances, the court may adjust the lodestar fee upward or downward based on a consideration of additional factors. *Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 124, 786 P.2d 265 (1990); RPC 1.5(a).

Trial courts must independently decide what represents a reasonable amount of attorney fees; they may not merely rely on the billing records of the prevailing party's attorney. *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 744, 733 P.2d 208 (1987). Trial courts must also create an adequate record for review of fee award decisions. *Mahler*, 135 Wn.2d at 435. Failure to create an adequate record will result in a remand of the award to the trial court to develop such a record. *Id.*

A. Equitable Factors

The cross-appellants first argue that the trial court did not properly segregate the time that Mayer's attorneys spent on the MTCA claim from the time they spent on the unsuccessful tort claims. Specifically, they argue that the court improperly awarded fees for time spent determining the cross-appellants' relative fault under MTCA.

 If attorney fees are recoverable for only some of a

party's claims, the award must properly reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues. *Dash Point Village Assocs. v. Exxon Corp.*, 86 Wn. App. 596, 611, 937 P.2d 1148 (1997). The trial court need not segregate the time if it determines that the various claims in the litigation are "so related that no reasonable segregation of successful and unsuccessful claims can be made." *Hume v. American Disposal Co.*, 124 Wn.2d 656, 673, 880 P.2d 988 (1994). In this case, fees were authorized only for the MTCA claim. *See* RCW 70.105D.080.

The trial court found that "a significant portion" of Mayer's fees and costs could not be segregated between claims. The court found that Mayer could recover fees for discovery of "evidence concerning the entire history of the generation, transportation, dumping and disposal of CKD," even though this evidence was also related to the tort claims. The court found that the evidence was related to the MTCA claim, because it helped to establish the defendants' relative fault.

 Mayer was not entitled to recover attorney fees for work performed discovering evidence of the parties' relative fault.Under MTCA, the defendants are strictly, and jointly and severally liable to Mayer. *See* RCW 70.105D.040(2). Evidence of the defendants' relative fault is relevant only to the court's allocation of comparative liability among the liable parties. *See Dash Point*, 86 Wn. App. at 606-07; RCW 70.105D.080. None of the cross-appellants asserted a MTCA counterclaim against Mayer or alleged that Mayer was a liable party under MTCA. The trial court did not find Mayer to be a liable party. Thus, evidence regarding the cross-appellants' relative fault was not relevant to Mayer's MTCA claim. The trial court abused its discretion in awarding Mayer fees for discovery of this evidence.

B. Contingent Fee Agreement

The cross-appellants next contest the hourly rate that the trial court used in calculating the attorney fee award. Mayer asked the trial court to apply his attorneys' custom-

ary hourly rate, which ranged from $150 to $200 per hour. The court agreed, finding that Mayer's requested rates were "fair and appropriate." The trial court disregarded the contingent fee agreement that Mayer had negotiated with his attorneys. Under that agreement, Mayer's attorneys were to receive $75 per hour plus a contingent fee equal to a percentage of any recovery on the tort claims. The agreement applied to all fees accrued after June 1994. The cross-appellants contend that the trial court's decision to disregard the contingent fee agreement was an abuse of discretion, because it resulted in a windfall for Mayer.

Under the lodestar method, the court multiplies the total number of attorney hours reasonably expended by the reasonable hourly rate of compensation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983). The lodestar amount may be adjusted, if appropriate, to reflect the contingent nature of the representation. *Id.* at 598-99. Although a trial court may consider the existence of a contingent fee agreement in making its award of attorney fees, it should not rely solely on the terms of such an agreement in determining the amount. *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 150, 768 P.2d 998,773 P.2d 420 (1989). The court must independently decide what constitutes a reasonable award. *Id.* at 151.

Mayer cites *Martinez v. City of Tacoma*, 81 Wn. App. 228, 914 P.2d 86 (1996), in support of his argument that the trial court properly disregarded the contingent fee agreement in this case. In *Martinez*, the plaintiff recovered only $8,000 in damages in an employment discrimination action. Under a contingent fee agreement between the plaintiff and his attorney, the attorney was to receive $62.50 per hour plus a percentage of the underlying gross recovery. The court held that the fee award was not limited by the terms of the contingent fee agreement. *Id.* at 237. The court based its holding on the "language and purpose" of the Law Against Discrimination and the public benefit advanced by civil rights litigation. *Id.* at 236. The court explained that

allowing the agreement to limit the fee award would discourage private attorneys from undertaking representation in civil rights cases where the damages likely to be recovered are small. *Id.* at 236.

The principles of *Martinez* apply equally to the present case. The purpose of MTCA is to facilitate hazardous waste cleanup and promote a more healthful environment. RCW 70.105D.010. Like civil rights litigation, private causes of action under MTCA benefit the public. We hold that, under *Martinez*, the trial court was not limited by the terms of the private fee agreement between Mayer and his attorneys in awarding MTCA attorney fees.

C. Specific Challenged Cost Items

The cross-appellants next argue that the trial court abused its discretion in disregarding their challenges to several of Mayer's attorneys' specific time entries.

In awarding attorney fees, the trial court must limit the lodestar to hours reasonably expended, and should discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d at 597.

The cross-appellants challenged several of the attorneys' time entries. They claimed that Mayer's attorneys had double charged for some of the work they performed. They also claimed that Mayer was requesting fees for wasted efforts, duplicative efforts, unidentifiable costs, and inconsistent or vaguely worded time entries. Finally, the cross-appellants claimed that Mayer was requesting fees for work unrelated to the MTCA claim. For instance, cross-appellants contested Mayer's request for fees for time spent drafting the initial complaint, which did not contain a MTCA claim. The court accepted Mayer's request in full as reasonable, without addressing any of the cross-appellants' specific challenges.

Because the trial court made no findings regarding the specific challenged items, the record does not allow for a

proper review of these issues. On remand, therefore, the trial court is directed to enter thorough findings regarding these specific challenged time entries.

## D. Disparity

Finally, the cross-appellants argue that the attorney fee award was unreasonable because it grossly exceeded the amount of the underlying recovery. The court awarded Mayer $274,302.05 in attorney fees and costs for his successful MTCA claim. Mayer received only $26,314 in remedial action costs for the MTCA claim.

▮ "We will not overturn a large attorney fee award in civil litigation merely because the amount at stake in the case is small." *Mahler v. Szucs*, 135 Wn.2d 398, 433, 957 P.2d 632 (1998). Again, the relevant question on appeal is whether the court properly applied the lodestar methodology. *Id.* at 433. The amount of the underlying judgment is relevant in determining the reasonableness of the fee award, but is not a conclusive factor. *Id.* at 433. Thus, on remand, the trial court may award an amount in attorney fees that is disproportionate to the underlying judgment, provided that the court follows the lodestar method.

▮ In summary, we reverse and remand the MTCA attorney fee award. On remand, the trial court may not award fees for effort spent discovering the cross-appellants' relative fault. Further, the trial court is not limited by the terms of the contingent fee agreement between Mayer and his attorneys. Finally, the court must make thorough findings on the cross-appellants' challenges to specific time entries. On remand, Mayer carries the burden of proving the reasonableness of the fees requested. *See Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 151, 859 P.2d 1210 (1993).

All four parties request attorney fees on appeal pursuant to RAP 18.1(a) and RCW 70.105D.080. There is no basis in statute, contract or equity to award attorney fees on appeal.

Reversed and remanded.

AGID, C.J., and COLEMAN, J., concur.

Review denied at 142 Wn.2d 1029 (2001).