[No. 54491-8-I.   Division One.   December 27, 2005.]

PACIFIC SOUND RESOURCES ET AL., *Appellants*, v. BURLINGTON NORTHERN SANTA FE RAILWAY CORP. ET AL., *Respondents*.

*Gillis E. Reavis* (of *Foster Pepper & Shefelman, P.L.L.C.*) and *David D. Dicks* and *Jennifer T. Barnett* (of *Cascadia Law Group*), for appellants.

*Jerret E. Sale, Deborah L. Carstens,* and *Thomas D. Adams* (of *Bullivant Houser Bailey, P.C.*) ( *John F. Barg* and *Marc A. Zeppetello,* of counsel) and *James C. Hanken,* for respondents.

*Robert M. McKenna, Attorney General,* and *Kristie E. Carevich* and *Christa L. Thompson, Assistants,* and *Steven J. Thiele* on behalf of Department of Ecology, amicus curiae.

¶1 SCHINDLER, J. — A contribution claim under Washington's Model Toxics Control Act (MTCA), chapter 70.105D RCW, for recovery of cleanup costs against other potentially liable persons must be brought within three years "from the date remedial action confirms cleanup standards are met."[1] While the legislature broadly defines "remedial action," it did not define what action "confirms" when cleanup standards are met. Pacific Sound Resources (PSR) and the port of Seattle (the Port) sued Burlington Northern Santa Fe Railway Corporation and J.H. Baxter and Company (collectively BNSF) and others[2] under the MTCA to recover environmental cleanup costs incurred at the PSR Superfund Site (Site). PSR and the Port also alleged claims under common law tort theories of negligence, nuisance, and trespass. On summary judgment, the trial court dismissed the lawsuit as barred by the statute of limitations. In dismissing the claims under the MTCA, the trial court relied on assertions in the final Remedial Investigation and

---

[1] RCW 70.105D.080.

[2] PSR and the Port also sued two defunct companies, J.M. Colman Company and Pacific Creosoting Company, and the State of Washington Department of Natural Resources (DNR). DNR is not a party to this appeal.

Feasibility Study (RI/FS) approved by the Environmental Protection Agency (EPA) to conclude PSR and the Port's contributions claims were barred by the statute of limitations.

¶2 We conclude that the language in RCW 70.105D.080 that "remedial action confirms cleanup standards are met" requires some official decision by the lead agency. EPA's approval of the RI/FS is not an official decision that triggers the statute of limitations. The RI/FS is a predecision document that identifies the nature and extent of the problems at the site and evaluates and recommends alternative cleanup actions. After completion of the RI/FS, the lead agency issues a formal decision selecting the cleanup action. Because we conclude that the earliest the statute of limitations began to run for the MTCA contribution claims was when EPA officially selected the cleanup remedy for the Site and established site cleanup levels in the Record of Decision (ROD), we need not definitively decide what remedial action "confirms" when cleanup standards are met under the MTCA. In order to fulfill the stated purpose of the statute to encourage and promote hazardous waste site cleanup by private parties, the legislature or the Washington Department of Ecology (DOE), through administrative rule making, needs to clearly define what remedial action confirms that cleanup standards are met under RCW 70.105D.080.

¶3 We conclude the common law tort theories are barred by the three-year statute of limitations because there were actual and substantial damages known well over three years before PSR and the Port filed their lawsuit. But we reverse the trial court's decision to dismiss the contribution claims under RCW 70.105D.080 and remand for trial.

## FACTS

¶4 The PSR Site was a wood-treatment facility that began operation in the early 1900s. PSR, formerly the Wyckoff West Seattle Wood Treating facility, owned and

operated the Site from 1959 to 1994. The Site is contaminated with creosote, pentachlorophenol, chemonite, and other hazardous substances. The Site is located on the south shore of Elliott Bay in the Puget Sound and includes 25 acres of upland property and 50 acres of adjacent aquatic lands.

¶5 In August 1984, EPA issued an administrative order directing PSR to investigate contamination at the facility. In March 1985, PSR's president and three of its employees pleaded guilty to criminal violations of federal environmental laws. In September 1987, PSR and EPA entered an Administrative Order on Consent (consent order) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601, and the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901-6992k. The consent order required PSR to complete the investigation of hazardous substances at the facility, study necessary corrective alternatives, perform interim corrective action, and submit a closure plan.

¶6 In January 1990, EPA issued another administrative order to PSR under CERCLA and RCRA. The order required PSR to prepare an RI/FS. As a part of the RI/FS, PSR conducted extensive investigations, including soil and groundwater sampling. In March 1990, PSR notified EPA that it did not have sufficient funds to complete the RI/FS. EPA estimated the cost to clean up the Site would be between $40 to $50 million.

¶7 Because PSR could not continue with cleanup efforts, EPA assumed primary responsibility for the Site under CERCLA. EPA designated two operable units at the Site for purposes of investigation: the Upland Unit that included soil and groundwater[3] and the Marine Sediments Unit, the adjacent offshore portion of the Site.[4] In May 1994, EPA

---

[3] Ground water is "water in a saturated zone or stratum beneath the surface of land or below a surface water." WAC 173-340-200.

[4] Marine sediments are "surface sediments in which the sediment pore water contains 25 parts per thousand salinity or greater." WAC 173-204-200(14). Surface sediments are "settled particulate matter located in the predominant biologically

listed the PSR Site on the National Priorities List for cleanup under CERCLA.[5]

¶8 In August 1994, PSR and EPA entered into a Consent Decree. The consent decree required PSR to contribute all its assets to the PSR Environmental Trust and to pay for cleanup actions at the Site. Under the consent decree, PSR contributed more than $10.5 million to remediate the Site.

¶9 While EPA was negotiating the consent decree with PSR, the Port began efforts to purchase the upland portion of the Site for container terminal operations. To limit its liability for cleanup costs at the Site, the Port negotiated a Prospective Purchaser Agreement (PPA) with EPA. Under the PPA, the Port agreed to deposit $9 million into the PSR Environmental Trust and to pay $7.2 million for environmental response activities at the Site and the adjacent properties. In exchange, EPA agreed that the Port would not be liable for future claims from preexisting contamination. The Port purchased the upland portion of the Site from PSR in October 1994.

¶10 In the Administrative Order on Consent re PSR Superfund Site, the Port agreed to assume responsibility to continue cleanup efforts at the Site including (1) project management, (2) assessing current conditions, (3) site stabilization and plant demolition, (4) early removal actions, (5) completing the RI/FS, and (6) surface capping.

¶11 In November 1994, EPA and the DOE entered a Memorandum of Understanding (MOU) defining the roles of EPA and DOE in relation to the cleanup of the upland portion of the Site. Under the MOU, EPA was the lead agency responsible for overseeing the investigation and cleanup at the Site. DOE was the support agency in the

active aquatic zone, or exposed to the water column. Sediment(s) also includes settled particulate matter exposed by human activity (e.g., dredging) to the biologically active aquatic zone or to the water column." WAC 173-204-200(26).

[5] Hazardous sites throughout the United States are placed on the National Priorities List and prioritized. The list guides EPA in determining which sites require further investigation and the extent of the risks to human health and the environment by the site. The list also identifies necessary remedial action and provides notice to the public and potentially responsible parties. 42 U.S.C § 9605.

cleanup process, which included evaluating and commenting on major decisions at the Site.

¶12 In 1995, the Port demolished the wood-treating facility and excavated and removed approximately 4,000 cubic yards of contaminated soil and sludge from the Site. In 1996, the Port installed a slurry wall to prevent contaminants from migrating from the upland area into the off-shore portion of the Site and to lessen the tidal effects on groundwater. The Port also installed a recovery trench to prevent contaminants from migrating into Elliot Bay. On June 30, 1998, the Port installed a low-permeability asphalt cap over the upland portion of the Site.

¶13 In June 1997, under the supervision of EPA, the Port completed the draft RI/FS for the groundwater in the upland portion of the Site. In preparing the RI/FS, the Port conducted three rounds of groundwater sampling and a "fate and transport analysis" to assess the groundwater quality at the Site. After receiving comments on the draft RI/FS from the Army Corps of Engineers, the Washington Department of Natural Resources and DOE, EPA directed the Port to prepare a final RI/FS. In November 1998, EPA approved the "Final Upland Groundwater Remedial Investigation and Feasibility Study Report." The final RI/FS states that groundwater in the upland portion of the Site "[c]omplies with cleanup standards."

¶14 Approximately a year later, on September 30, 1999, EPA issued a ROD[6] for the Site. Based on the RI/FS analysis, EPA formally adopted a cleanup plan for the entire Site and selected containment remedies in the ROD. The ROD states that "PSR groundwater meets cleanup requirements" and that the early remedial action constitutes the final action for the upland unit, but additionally required engineering controls, institutional controls, and monitoring to confirm the remedial actions were effective.

---

[6] The ROD under CERCLA is analogous to the Cleanup Action Plan under the MTCA. WAC 173-340-380(4).

¶15 On September 25, 2002, PSR and the Port sued several defendants including BNSF for cleanup costs contribution under the MTCA, RCW 70.105D.080.[7] PSR and the Port also sued under common law tort theories of negligence, nuisance, and trespass. On summary judgment, the trial court dismissed all of PSR's and the Port's claims against BNSF based on expiration of the three-year statute of limitations. The trial court denied PSR's and the Port's motion for reconsideration or clarification.[8]

¶16 PSR and the Port appeal the summary judgment dismissal of their claims for contribution under the MTCA and common law tort claims, and denial of their motion for reconsideration or clarification.

## ANALYSIS

### Statute of Limitations for Contribution Claims under the MTCA

¶17 This case raises the issue of what type of remedial action "confirms when cleanup standards are met" at a contaminated hazardous waste site for purposes of triggering the statute of limitations for an action to recover cleanup costs under RCW 70.105D.080. RCW 70.105D.080 provides in pertinent part: "An action under this section may be brought after remedial action costs are incurred but

---

[7] PSR and the Port allege that Burlington Northern and J.H. Baxter & Co. are potentially liable persons under RCW 70.105D.040(1)(a)-(c). A potentially liable person is "any person who the department finds, based on credible evidence, to be liable under RCW 70.105D.040." RCW 70.105D.020(16); WAC 173-340-200. Liable persons are "strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." RCW 70.105D.040(2). According to PSR and the Port, Burlington and its corporate predecessors owned a portion of the Site, conducted operations at the Site, and owned and used hazardous wood-treating chemicals at the Site from the 1930s to the 1980s. And in the 1950s, Baxter operated the Site in a joint venture with PSR's corporate predecessors.

[8] In the motion for reconsideration or clarification, PSR and the Port requested the court to clarify whether the complaint included claims for cleanup costs related to the marine sediments portion of the Site. The court ruled the complaint did not allege claims for cleanup costs in the offshore portion of the Site.

While we disagree with the trial court's decision, because we reverse and remand for trial, we need not address this issue. Nevertheless, under CR 8 the complaint sought contribution for the remedial costs incurred at the entire Site, including sediments.

must be brought within three years from the date *remedial action confirms cleanup standards are met.*[9]

¶18 PSR and the Port contend that the trial court erred in adopting BNSF's position that the three-year statute of limitations in RCW 70.105D.080 began when EPA approved the final RI/FS in November 1998. BNSF's argument relies on the statutory definition of "remedial action" and the conclusion of the RI/FS, which states that "remedial measures already implemented in the upland are protective of surface water quality at the POC (meets cleanup levels)" and that the groundwater "complies with cleanup standards."[10]

¶19 PSR and the Port rely on DOE regulations to contend that the statute of limitations is not triggered by approval of the RI/FS but when performance monitoring verifies cleanup standards have been met.[11] As amicus, DOE takes the position that performance monitoring is the only type of remedial action that can confirm cleanup standards have been met. We reject reliance on approval of the final RI/FS as the remedial action that "confirms cleanup standards are met" and conclude that the earliest decision triggering the statute of limitations was EPA's issuance of the ROD on September 30, 1999. Therefore, PSR and the Port's contribution claims under the MTCA are not barred by the statute of limitations.

¶20 We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wn.2d 784, 790, 16 P.3d 574 (2001); *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 487, 84 P.3d 1231 (2004). Summary judgment is proper when the pleadings and affidavits show there is no

---

[9] (Emphasis added.)

[10] The RI/FS also stated that "threshold requirements for cleanup actions under MTCA (WAC 173-340-360(2)) call for *monitoring to ensure compliance*. Monitoring is a key component of the groundwater management plan described herein for the PSR site." (Emphasis added.)

[11] Performance monitoring is one of three types of compliance monitoring, which is specifically defined as a "remedial action." WAC 173-340-200, -410.

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Facts and reasonable inferences are viewed in a light most favorable to the nonmoving party. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794, 64 P.3d 22 (2003). Summary judgment is appropriate if, in view of all the evidence, reasonable persons could reach only one conclusion. *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

¶21 Statutory interpretation is a question of law reviewed de novo. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004). We interpret statutes to effectuate legislative intent. *Cherry v. Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991). In determining legislative intent, we look first to the language of the statute. *Lacey Nursing Ctr. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). In ascertaining the meaning of a particular word in a statute, we must consider both the statute's subject matter and the context in which the word is used. *Chamberlain v. Dep't of Transp.*, 79 Wn. App. 212, 217, 901 P.2d 344 (1995). "Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). If an undefined statutory term is not technical, a dictionary definition may be used to establish the meaning of the word. *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005). Under RCW 70.105D.910, the MTCA's statute of limitations must be liberally construed to effectuate the purposes of the statute.

¶22 The MTCA, chapter 70.105D RCW, governs hazardous waste cleanup in Washington. The policy of the MTCA is to define the role of government in hazardous waste cleanup, encourage participation in cleanup decision making and "raise sufficient funds to clean up all hazardous waste sites and to prevent the creation of future hazards due to improper disposal of toxic wastes into the state's land and waters." RCW 70.105D.010(2). The MTCA establishes a

state program administered by DOE and authorizes DOE to promulgate regulations necessary to administer and enforce the Act. RCW 70.105D.030.[12] The MTCA recognizes that the costs of eliminating environmental "threats in many cases are beyond the financial means of our local governments and ratepayers." RCW 70.105D.010(2). Accordingly, the MTCA holds responsible persons strictly liable, jointly and severally, and creates a private right of action for contribution to recover remedial action costs. *See* RCW 70.105D.040, .080.[13]

¶23 The MTCA broadly defines a "remedy" or "remedial action" as:

> any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance and any health assessments or health effects studies conducted in order to determine the risk or potential risk to human health.[14]

¶24 Here, it is undisputed that the RI/FS is a remedial action as defined in the MTCA. It is also undisputed that EPA approved the final RI/FS. BNSF, therefore, contends that the final RI/FS is the remedial action that triggered the statute of limitations under RCW 70.105D.080. We disagree. BNSF's position ignores the purpose of the RI/FS and the ROD and does not give meaning to the plain language of the statute.

¶25 The MTCA's regulatory scheme suggests a technical meaning for the term "confirm," but neither the legislature nor DOE has defined what type of remedial action confirms cleanup standards are met in order to trigger the statute of

---

[12] The MTCA regulations are located in chapter 173-340 WAC.

[13] *See also* RCW 70.105D.040(1); WAC 173-340-545(1). The parties do not dispute that PSR has the right to bring an action for contribution under the MTCA, even though EPA led the cleanup action under CERCLA and DOE was only a supporting agency in the cleanup process.

[14] RCW 70.105D.020(21); *accord* WAC 173-340-200.

limitations.[15] The dictionary defines confirm as "to make valid by formal assent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 476 (1966). Given the significance of private contribution actions in the statutory scheme, we conclude that the legislature clearly contemplated an official agency decision by using the phrase "confirms cleanup standards are met" in RCW 70.105D.080. The legislature did not just say the statute of limitations begins "when cleanup standards are met," but rather when "remedial action *confirms* cleanup standards are met."

¶26 Under the MTCA and CERCLA, development of cleanup standards begins with the RI/FS. The cleanup standards are not officially adopted until the remedy is selected in the Cleanup Action Plan (CAP) under the MTCA or in the ROD under CERCLA. The RI/FS serves as the basis for the decision selecting the remedy for the Site under the MTCA and CERCLA. The RI/FS is a predecision document typically prepared by a potentially liable person that defines and analyzes the scope of contamination, proposed actions, and alternative remedies. Under the MTCA, the purpose of an RI/FS is "to collect, develop, and evaluate sufficient information regarding a site to select a cleanup action." WAC 173-340-350(1), -200. Similarly, the purpose of the RI/FS under CERCLA "is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives." 40 C.F.R. § 300.430(a)(2).

¶27 Based on the final RI/FS, EPA develops a proposed plan. 40 C.F.R. § 300.430(f)(2). EPA publishes the proposed plan for public comment and analyzes the remedial options

---

[15] *See* WAC 173-340-410(1)(b) (stating the purpose of performance monitoring is to "[c]onfirm that the interim action or cleanup action has attained cleanup standards"); WAC 173-340-700(7) (setting forth procedures for demonstrating compliance with cleanup standards). Additionally, the provision for statute of limitations under CERCLA is very different from the MTCA. *See* 42 U.S.C. § 9613(g)(2). Consequently, federal case law interpreting the statute of limitations under CERCLA is not helpful. *See Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 427-28, 833 P.2d 375 (1992); RCW 70.105D.910.

in the RI/FS. 40 C.F.R. § 300.430(f)(3). Thereafter, EPA selects the remedy in the ROD. 40 C.F.R. § 300.430(f)(5).

¶28 The CAP under the MTCA, and the ROD under CERCLA, is the final decision issued by the lead agency that establishes the cleanup levels and adopts the final cleanup action/plan.[16] Under CERCLA,

> The selection of a remedial action is a two-step process and shall proceed in accordance with § 300.515(e). First, the lead agency, in conjunction with the support agency, identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment. Second, the lead agency shall review the public comments and consult with the state (or support agency) in order to determine if the alternative remains the most appropriate remedial action for the site or site problem. The lead agency, as specified in § 300.515(e), makes the final remedy selection decision, which shall be documented in the ROD.[17]

¶29 Under the MTCA, DOE adopts a final CAP based on the following criteria:

(i) A general description of the proposed cleanup action developed in accordance with WAC 173-340-350 through 173-340-390.

(ii) A summary of the rationale for selecting the proposed alternative.

(iii) A brief summary of other cleanup action alternatives evaluated in the remedial investigation/feasibility study.

(iv) Cleanup standards and, where applicable, remediation levels, for each hazardous substance and for each medium of concern at the site.

(v) The schedule for implementation of the cleanup action plan including, if known, restoration time frame.

(vi) Institutional controls, if any, required as part of the proposed cleanup action.

(vii) Applicable state and federal laws, if any, for the proposed cleanup action, when these are known at this step in the

---

[16] Under the MTCA, the CAP is analogous to the ROD. *See* WAC 173-340-380(4).

[17] 40 C.F.R. § 300.430(f)(1)(ii).

cleanup process (this does not preclude subsequent identification of applicable state and federal laws).

(viii) A preliminary determination by the department that the proposed cleanup action will comply with WAC 173-340-360.

(ix) Where the cleanup action involves on-site containment, specification of the types, levels, and amounts of hazardous substances remaining on site and the measures that will be used to prevent migration and contact with those substances.[18]

Here, the RI/FS prepared by the Port contains a "fate and transport analysis" based on the data analyzed at that time. Based on these predictions, the RI/FS concluded the response actions already taken at the Site were effective and cleanup standards were met.

The findings of this RI/FS support the conclusion that remedial measures already implemented in the upland are protective of surface water quality at the POC (meets cleanup levels), and that additional remedial actions in the upland are not necessary. This finding satisfies MTCA requirements for groundwater cleanup actions (WAC 173-340-720(2) and WAC 173-340-720(6)).

The RI/FS also stated that:

Based on an assessment of both current and foreseeable future conditions, the groundwater at PSR: [(1)] Is protective of human health and the environment[; (2)] *Complies with cleanup standards* [; and (3)] Complies with applicable state and federal laws . . . .[19]

But the RI/FS acknowledged the need for monitoring to ensure effectiveness for the imposed remedy:

In addition to the three items listed above, threshold requirements for cleanup actions under MTCA (WAC 173-340-360(2)) call for *monitoring to ensure compliance.* Monitoring is a key

---

[18] WAC 173-340-380(1)(a).

[19] (Emphasis added.)

component of the groundwater management plan described herein for the PSR site.[20]

¶30 EPA did not select the final cleanup standards until it issued the ROD. The ROD is the decision document that adopted the "Selected Remedy" under CERCLA for the Site. In the ROD, the remediation objectives and the alternatives are analyzed and described. EPA formally adopted a cleanup plan in the ROD for the entire Site and identified containment remedies. To ensure the remedial actions in the Upland Unit remained effective, the ROD also required further engineering controls, institutional controls, and monitoring. For the Upland Unit, the ROD adopted the selected remedy:

> These cleanup actions have addressed the contaminated soil and on-going sources to the off-shore marine environment. What was selected as early action is final action with the addition of the following:
>
> • Inspection and Maintenance (I&M) of the surface cap;
>
> • Monitoring groundwater and collection of the NAPL;
>
> • Institutional controls for prohibiting groundwater use restricting land use.

¶31 Because the RI/FS is not an official action by the lead agency, adoption of the RI/FS as a remedial action did not trigger the running of the statute of limitations in this case.[21] We conclude the earliest official agency action that could have triggered the statute of limitations was on September 30, 1999, when EPA formally selected cleanup

---

[20] (Emphasis added.)

[21] BNSF also argues in the alternative that the statute of limitations was triggered when the final remedial act of installing an asphalt cap was completed June 1998. Neither the language in RCW 70.105D.080 nor the MTCA regulations support the proposition that any remedial action that occurs last at a site could confirm cleanup standards have been met. And BNSF cites no legal authority to support its argument. Arguments that are not supported by citation to legal authority will not be considered on appeal. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a)(5).

levels and remedies in the ROD. Consequently, PSR and the Port timely filed their lawsuit on September 25, 2002.[22]

## Common Law Claims

¶32 PSR and the Port contend that their claims for negligence, nuisance, and trespass are not barred by the statute of limitations, and the trial court erred in granting summary judgment on that basis. The tort claims arise from the same facts and the parties agree that all three claims are subject to a three-year statute of limitations.[23] PSR and the Port acknowledge that under a general application of the statute of limitations, its claims accrued over three years before they filed the lawsuit on September 25, 2002. They argue, however, that the claims are not barred by the statute of limitations because they are continuing torts.

¶33 Washington recognizes the theory of continuing torts. *See Island Lime Co. v. Seattle*, 122 Wash. 632, 211 P. 285 (1922) (nuisance); *Doran v. City of Seattle*, 24 Wash. 182, 183, 64 P. 230 (1901) (negligence); *Fradkin v. Northshore Util. Dist.*, 96 Wn. App. 118, 977 P.2d 1265 (1999) (trespass). When a tort is continuing, the "statute of limitations runs from the date each successive *cause of action accrues as manifested by actual and substantial damages.*"[24] *Fradkin*, 96 Wn. App. at 125 (emphasis added). A tort is continuing if the intrusive condition is reasonably abatable and not permanent. *Id.* The tort continues until the intrusive substance is removed. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 693, 709 P.2d 782 (1985).

---

[22] Because we conclude that the statute of limitations in RCW 70.105D.080 has not run for the Upland Unit of the PSR Site, we need not address whether each operable unit, designated by EPA under CERCLA, has an independent statute of limitations period under the MTCA. Because BNSF is not a prevailing party, it is also unnecessary to address attorneys' fees and costs under RCW 70.105D.080.

[23] *But see Mayer v. City of Seattle*, 102 Wn. App. 66, 75, 10 P.3d 408 (2000) (recognizing that a claim for nuisance has a two-year statute of limitations); RCW 4.16.130.

[24] The discovery rule does not apply to continuing torts. *Fradkin*, 96 Wn. App. at 125.

¶34 Here, even if the conditions are reasonably abatable, there were known actual and substantial damages well over three years before PSR and the Port filed the lawsuit. The complaint states that PSR expended substantial funds in investigations and cleanup efforts at the PSR Site prior to May 1994. And the Port knew of substantial damages in 1994, when it agreed under the PPA to pay $9,000,000 into the PSR Environmental Trust and to provide in-kind environmental response activities valued at $7,200,000, and agreed to continue cleanup of the Site. Under these circumstances, the common law tort claims accrued more than three years before PSR and the Port filed their lawsuit in September 25, 2002. The trial court did not err in dismissing the common law tort claims on summary judgment.

## CONCLUSION

¶35 We conclude that the common law tort theories of trespass, nuisance, and negligence are barred by the statute of limitations and affirm the trial court's decision to dismiss those claims on summary judgment, but we conclude the trial court erred in dismissing the contribution claims under the MTCA and reverse and remand for trial.

AGID and ELLINGTON, JJ., concur.